NATIONAL BLACK POLICE ASSOCIA-
TION et al., Appellants,

v.

Richard W. VELDE, Individually and in
his official capacity as Administrator of
the Law Enforcement Assistance Ad-
min., et al.

No. 77–1273.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 5, 1979.

Decided May 14, 1980.

Rehearing Denied Aug. 1, 1980.

Bennett Boskey, Washington, D. C., was on brief, for appellee, Levi.

E. Richard Larson, New York City, with whom William E. Caldwell, Washington, D. C., was on brief, for appellants.

Barbara L. Herwig, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., Barbara Allen Babcock, Asst. Atty. Gen. and Robert K. Kopp, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge and PARKER *, United States District Court Judge for the District of Columbia.

Opinion for the Court filed by Senior · Circuit Judge BAZELON.

Opinion concurring in part, concurring in result in part, and dissenting in part filed by Circuit Judge TAMM.

BAZELON, Senior Circuit Judge:

Appellants, twelve individuals and an organization,[1] appeal the district court's dismissal of their complaint. They alleged

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The individual appellants include six blacks and six women who alleged that they were denied employment, passed over for promotion, or discharged solely on the basis of their race or sex by state and local law enforcement agencies that receive funds from the Law Enforcement Assistance Administration (LEAA). The organizational appellant is the National Black Police Association, a not-for-profit Illinois corporation with over 50 affiliates in at least 20 states.

that federal agencies and officials unlawfully failed to terminate federal funding of state and local law enforcement agencies despite evidence that the funds were "used to discriminate on grounds of race and sex against plaintiffs and members of their class."[2] Appellants sought declaratory and injunctive relief against the Law Enforcement Assistance Administration (LEAA),[3] the Department of Justice and four officials in those agencies. Appellants also sought compensatory and punitive damages against the four officials in their individual capacities.[4]

Relying on the doctrines of mootness and official immunity, the district court dismissed all of appellant's claims. For reasons that appear below, we reverse.

## I.

■ On the basis of 1976 amendments to the Omnibus Crime Control and Safe Streets Act of 1968 (Omnibus Crime Control Act),[5] the district court dismissed appellants' claims for declaratory and injunctive relief as moot. We disagree.

The Omnibus Crime Control Act was first amended in 1973 to require LEAA to terminate federal funding to recipients that engage in discriminatory practices.[6] In response to LEAA's failure to carry out this civil rights enforcement requirement,[7] Congress amended the Act in 1976[8] by adding more detailed mandatory procedures to be followed by LEAA in either securing compliance with the Act's antidiscrimination provision or terminating funds to noncomplying recipients.

The 1976 amendments have no bearing on appellants' claims that they were injured as a result of appellees' conduct, or on appellees' civil rights enforcement duties under either the Omnibus Crime Control Act or the other constitutional and statutory provisions upon which appellants base their claims for relief.[9] Thus, the 1976 amendments did not render any of appellants' claims moot and, on remand, appellants will be entitled to proceed on all causes of action stated in their complaint.[10]

## II.

The district court dismissed appellants' claims for monetary damages against the

---

2. Complaint ¶ 1, Appendix (App.) 5. Plaintiffs moved for class certification, but the district court did not rule on the motion before it dismissed the action.

3. The LEAA, an agency within the Department of Justice, was created by Congress in 1968 to assist community and citizen groups in their law enforcement and criminal justice activities. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, tit. I, 82 Stat. 197 (1968), (current version at 42 U.S.C. §§ 3701 *et seq.* (1976)).

4. Complaint at p. 35, App. 38.

5. Pub.L. No. 90–351, 82 Stat. 206 (1968).

6. Pub.L. No. 93–83, § 2, 87 Stat. 214, 42 U.S.C. § 3766(c) (1976).

7. The House Report on the 1976 amendments stated that "[t]he response of LEAA to the 1973 civil rights amendments has been less than minimal." H.R.Rep. No. 94–1155, 94th Cong., 2d Sess. 11 (1976). The report also stated that LEAA had not terminated its funding of any recipient "[ ]despite positive findings of discrimination by courts and administrative agencies . . . ." *Id.*

8. Pub.L. No. 94–503, § 122(b), 90 Stat. 2418 (1976), 42 U.S.C. § 3766(c)(2) (1976).

9. In addition to their claims under the Omnibus Crime Control Act, appellants purported to state causes of action under the fifth and fourteenth amendments; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d to 2000d–4 (1976); *id.* §§ 1981, 1983, 1986; and Executive Orders No. 11,246 and 11,375.

10. Some of appellants' requests for injunctive and declaratory relief, as well as the claims for damages, are based upon allegations of LEAA's past failure to terminate funding to offending law enforcement agencies. These claims are utterly unaffected by the 1976 amendments. Moreover, appellees' underlying obligation to secure compliance with civil rights obligations or terminate funding is not affected by the 1976 amendments. Thus, the claims for declaratory and injunctive relief that are prospective in nature are based upon allegations of injury that have not been affected by the amendments. To the extent that these prospective claims require proof of LEAA's present failure to follow the new procedures required by the Omnibus Crime Control Act, appellants should be given the opportunity to prove such failure.

four agency officials in their individual capacities on the ground of absolute immunity. Subsequent to the district court's decision, however, the Supreme Court limited the doctrine of official immunity. We find this case now falls outside those limits, and thus reverse the district court's dismissal of the claims for monetary damages.

■ In *Butz v. Economou*,[11] the Supreme Court held that as a general rule, federal officials obtain only a qualified immunity in suits raising constitutional violations. Instead of an absolute immunity, federal officials can be sued and can defend only on the basis of good faith and reasonable grounds for their conduct.[12]

■ Appellees claim they are covered by a limited exception for administrative officials performing judicial and prosecutorial functions. Recognized by the Supreme Court in *Economou*, this exception was carved out to preserve absolute immunity where "essential for the conduct of the public business." 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). As the Court reasoned, absolute immunity is necessary to protect discretionary prosecutorial decisions from the potentially distorting effect of civil liability.[13] Appellees claim that the complaint challenges "the conduct of LEAA's prosecutorial role in enforcing civil rights laws"[14] and thus should be met by a defense of absolute immunity. We cannot agree.

The purpose of shielding discretionary prosecutorial decisions from fears of civil liability has no place where, as here, agency officials lack discretion. Appellees have virtually no discretion under the relevant statute in deciding whether to terminate LEAA funding of discriminatory recipients. The Omnibus Crime Control Act, as amended in 1973, provides that

. . . [w]henever the Administration determines that a State government or any unit of general local government has failed to comply with [the nondiscrimination requirement] or an applicable regulation, it shall notify the chief executive of the State of the noncompliance and shall request the chief executive to secure compliance. If within a reasonable time after such notification the chief executive fails or refuses to secure compliance, the Administration shall exercise . . .

its fund termination powers.[15] The minimal matters left to LEAA's judgment—such as the assessment of "reasonable time after notification"—do not rise to the level of prosecutorial discretion that is protected by absolute immunity. Accordingly, we find that appellees have only a defense of qualified immunity and reverse the district court's dismissal of the claims for monetary damages. Appellants should be allowed to go to trial on their claims for damages and appellees given a chance to establish a defense of good faith or reasonable grounds for their conduct.[16]

11. 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

12. The Court limited the availability of an absolute immunity defense to actions raising common-law tort causes of action. *See* 438 U.S. at 488–89, 98 S.Ct. at 2901–2902 (construing *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (libel action)).

13. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought. . . .

　　*　*　*　*　*　*

The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete.

438 U.S. 478, 515, 98 S.Ct. 2894, 2915, 57 L.Ed.2d 895 (1978).

14. Appellees' Supp. Br. at 4.

15. The mandatory language of 42 U.S.C. § 3766(c)(2) (Supp. V 1975) (amended 1976), when read in light of appellees' constitutional and independent statutory duty not to allow federal funds to be used in a discriminatory manner by recipients, takes appellees' civil rights enforcement duties outside the realm of discretion. *See Brown v. Califano*, 627 F.2d 1221 (D.C.Cir.1980).

16. Appellees also raise, as they did in the district court, the issue of appellants' standing to maintain this action. The National Black Police Association's standing has not—and indeed it cannot—be challenged. It alleged harm to

## III.

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings not inconsistent with this opinion.

*So ordered.*

TAMM, Circuit Judge, concurring in part, concurring in result in part, and dissenting in part:

The majority opinion in this case deals with three issues: mootness,[1] standing,[2] and official immunity.[3] I concur in Judge Bazelon's analysis and result on the mootness question and therefore do not address that issue further. Although I also agree that plaintiffs-appellants have standing adequate to survive a motion to dismiss, I reach this result by a route different from that of the majority. On the question of whether the individual defendants are protected by absolute immunity, I dissent.[4]

itself and its members as a result of appellees' alleged failure to terminate funding to discriminatory recipients. *Cf. Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). Similarly, individual appellants have alleged violations of their right to be free from federal funding of state and local agencies that have discriminated against them. They have a sufficiently "personal stake in the outcome of the controversy," *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), and their interest is precisely that which is protected by the Constitution and the statutes under which appellants have proceeded, *Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The 1976 amendments to the Omnibus Crime Control Act, which added a judicial review provision for parties such as appellants, remove any doubt as to appellants' standing. Pub.L. No. 94–503, § 122(b), 90 Stat. 2421 (1976), 42 U.S.C. § 3766(c)(4)(A) (1976), and we are satisfied that—absent a failure of proof after discovery is completed—appellants have standing to maintain this action. The district court did not rule on appellants' standing argument, and we expect that the district court will dispose of the pending motion to dismiss for lack of standing, along with pending motions to resume discovery and for class certification on remand.

1. *See* Maj.Op. at 786.

## I. STANDING

In *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), the Supreme Court summarized the law of standing. "In order to satisfy Art. III, the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Id.* at 99, 99 S.Ct. at 1608. Moreover, [e]ven when a case falls within these constitutional boundaries, a plaintiff may still lack standing under . . . prudential principles [if he does not] assert an injury that is peculiar to himself or to a distinct group of which he is a part, rather than one "shared in substantially equal measure by all or a large class of citizens."

*Id.* at 99–100, 99 S.Ct. at 1608 (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Although Congress may modify such prudential principles,[5] it may not "abrogate the Art. III

2. *See id.* at 787 n. 16.

3. *See id.* at 786-787.

4. Congress recently enacted the Justice System Improvement Act of 1979, Pub.L.No. 96–157, 93 Stat. 1167, which amends and recodifies the statutory provisions governing the Law Enforcement Assistance Administration (LEAA). This enactment does not bear on the present action, *see id.* § 1301(e), and therefore is not addressed in this opinion.

5. Congress has not modified these principles for actions such as the present one. Contrary to the majority's statement, *see* Maj.Op. at 787 n. 16, 42 U.S.C. § 3766(c)(4)(A) (1976) does not attempt to confer standing on litigants such as the plaintiffs here. As the statute on its face suggests, and as its legislative history confirms, the provision in question only authorizes an action against *state or local* governments or officials that have discriminated in violation of 42 U.S.C. § 3766(c) (1976). No action against the federal government or its officials was intended, and thus the present suit is not authorized by this statute.

Section 3766(c)(4)(A) provides:

'Whenever a State government or unit of local government, or any officer or employee thereof acting in an official capacity, has engaged or is engaging in any act or practice prohibited by this subsection, a civil action may be instituted after exhaustion of admin-

minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself,' [*Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206], that is likely to be redressed if the requested relief is granted. *Simon v. Eastern Kentucky Welfare Rights Org.,* [426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)]." *Id.* at 100, 99 S.Ct. at 1608.[6]

In the present case, plaintiffs allege that state and local entities funded by the Law Enforcement Assistance Administration (LEAA) have unlawfully discriminated against them.[7] Being subjected to unlaw-

---

istrative remedies by the person aggrieved in an appropriate United States district court or in a State court of general jurisdiction. Administrative remedies shall be deemed to be exhausted upon the expiration of sixty days after the date of the administrative complaint was filed with the Administration, or any other administrative enforcement agency, unless within such period there has been a determination by the Administration or the agency on the merits of the complaint, in which case such remedies shall be deemed exhausted at the time the determination becomes final.

42 U.S.C. § 3766(c)(4)(A) (1976). Although the statute does not expressly state against whom "a civil action may be instituted," the language of the statute rather clearly reveals an intent to authorize a private action only against those entities or individuals that have actually engaged in the discrimination.

The legislative history of § 3766(c)(4)(A) confirms this view. Although a House of Representatives committee report on the legislation contains a statement suggesting the availability of an action "against the United States" as well as against state and local governments and officials, *see* H.R.Rep.No. 94–1155, 94th Cong., 2d Sess. 27 (1976), the language contained in § 3766(c)(4)(A) was added by a House floor amendment *after* the House Judiciary Committee had adopted this report, *see* 122 Cong.Rec. 28,513–14 (1976). In support of this floor amendment, Representative Butler stated: "[P]rivate civil actions are authorized against *a State government or unit of local government* where an officer or employee in an official capacity has engaged in a pattern or practice of discrimination prohibited by this section." *Id.* at 28,514 (emphasis added). The Senate version of the legislation had no provision comparable to § 3766(c)(4)(A), but the Senate agreed to the provision as part of a conference report that resolved House and Senate differences. *See* 122 Cong.Rec. 33,879–84 (1976). In support of the conference report, Senator Hruska described the private-action provision contained in the report:

[T]he act authorizes private private parties to initiate civil actions in Federal or State courts against *a State government or unit of local government or any officer or employee thereof* acting in an official capacity whenever such government employee or officer has engaged or is engaging in any discriminatory act or practice prohibited by the LEAA Act.

This provision is an analogy to title 42, section 19[83], United States Code, which authorizes action in Federal court against State or local officials acting under color of law.

*Id.* at 33,880 (emphasis added).

The fact that Congress considered the possibility of a cause of action against federal officials, but instead adopted a provision authorizing suits only against state or local officials, may well bear on the merits of plaintiffs' claims in this case. Like the majority, however, I believe it inadvisable to express any views on the merits of this case without a more complete evidentiary record and without a district court consideration of the many issues that are presented.

**6.** It would seem a fine line indeed between the prudential principle that a plaintiff must assert "an injury that is peculiar to himself" and the supposedly less stringent constitutional requirement that he assert "a distinct and palpable injury to himself."

**7.** Plaintiffs also claim that the Government's standing

argument is wrong for the simple reason that it has a mistaken premise, namely, the statement that plaintiffs' "alleged injuries" are the "alleged racial discrimination by certain state and local law enforcement agencies." This is *not* the legal injury which forms the basis of *this* lawsuit. Rather, the legal injury which plaintiffs suffer is defendants' knowing funding of discriminatory law enforcement agencies in contravention of constitutional and statutory obligations owed by *defendants* to plaintiffs.

Reply Brief for Appellants at 27 (emphasis in original). In making this claim of injury, plaintiffs expressly eschew any reliance on their status as taxpayers. Transcript of Oral Argument at 6.

This claim of injury must be rejected. If plaintiffs are saying that their injury derives from being discriminated against with federal, as opposed to state or local, funding, their supposed "injury" is too tenuous and abstract to suffice as a basis for standing. If, on the other hand, they are claiming an injury merely in the fact that the defendants fund unlawful discrimination, without regard to whether they personally are victims of the discrimination, this does not constitute " 'a distinct and palpable injury to [themselves],' " *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99

ful discrimination is clearly a distinct and personal injury sufficient to satisfy both article III and the prudential standing rules. The more difficult question relates to "the redressability aspect of standing," *Greater Tampa Chamber of Commerce v. Goldschmidt*, 627 F.2d 258 at 265 (D.C. Cir.1980), which is part of "the Art. III minima," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. at 100, 99 S.Ct. at 1608.[8] Under this aspect of the standing doctrine, a plaintiff must show "an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 38, 96 S.Ct. at 1924. In other words, "there [must be] a 'substantial likelihood' that the relief requested will redress the injury claimed . . . ." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978). As this court has observed, recent Supreme Court cases "reveal[ ] the seriousness with which the Supreme Court has taken" this aspect of standing. *Greater Tampa Chamber of Commerce v. Goldschmidt*, at 261. *See also NAACP, Boston Chapter v. Harris*, 607 F.2d 514, 520–22, 524 (1st Cir. 1979).

In arguing that plaintiffs lack standing, the Government relies heavily on *Simon v. Eastern Kentucky Welfare Rights Organization*. In *Eastern Kentucky*, a group of indigents contended that the Internal Revenue Service had violated its statutory obligations by granting favorable tax treatment to nonprofit hospitals even though the hospitals denied most services to indigents. The Court found that the indigents lacked standing, because it was "purely specula-

tive" that a favorable court decision would redress their injuries: "So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services." 426 U.S. at 42–43, 96 S.Ct. at 1926.

The Government argues that the *Eastern Kentucky* rationale applies in the present case

> since [plaintiffs] cannot show that their alleged injuries (alleged racial discrimination by certain state and local law enforcement agencies) are likely to be redressed by a favorable decision and the judicial relief they seek (the termination of LEAA funding to those state and local agencies). Plaintiffs cannot make this showing because the state and local agencies might well choose not to receive LEAA funding rather than to discontinue their challenged practices.

Brief for Appellees at 34–35 (citations omitted). This case, however, comes to us on a motion to dismiss, granted by the district court before any discovery or evidentiary proceedings had begun. Thus, although the Government might be correct in asserting that plaintiffs cannot establish "the redressability aspect of standing," they have not yet had an opportunity to do so.[9] In *Committee for Full Employment v. Blumenthal*, 606 F.2d 1062 (D.C.Cir.1979) (Bazelon, J.), this court faced a nearly identical situation. The plaintiffs in that case had sued the Secretary of the Treasury for failing to discontinue the funding of state and local governments that, according to the

---

S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)), let alone "an injury that is peculiar to [themselves] or to a distinct group of which [they are] a part, rather than one 'shared in substantially equal measure by all or a large class of citizens," *id.* at 100, 99 S.Ct. at 1608 (quoting *Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. at 2205). Such a generalized grievance simply does not constitute sufficient "injury" for the purpose of standing to sue in the federal courts.

8. Because this aspect of standing is constitutionally required, the presence of a statute attempting to modify this rule would not be controlling. *See also* notes 5–6 *supra*.

9. Although standing is usually decided on the pleadings, the question sometimes depends on the development of evidence concerning the factual requisites for establishing standing. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 1616, n. 31, 60 L.Ed.2d 66 (1979); *NAACP, Boston Chapter v. Harris*, 607 F.2d 514, 526 (1st Cir. 1979).

plaintiffs, had unlawfully discriminated against them. This court reversed the district court's decision to dismiss the action for lack of standing:

> At the very least, appellants were entitled to conduct discovery to buttress their allegation that there is a substantial likelihood that the relief they request will eliminate their injury. Their pleadings are not so deficient on their face, nor so implausible, that the district court was entitled to conclude the standing issue on a motion to dismiss.

*Id.* at 1067. Likewise, at this stage of the proceedings in the present case, plaintiffs' pleadings are sufficient to resist a motion to dismiss based on standing. In my view, contrary to the majority's suggestion, *see* Maj. Op. at 787 n.16, the district court should defer its final determination of the standing question until evidence is presented on the redressability issue.[10]

## II. OFFICIAL IMMUNITY

The majority holds that the four individual defendants in this case are entitled only to qualified, and not to absolute, immunity in resisting plaintiffs' claims for monetary damages. I disagree.

In *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court ruled that a federal official's immunity from monetary liability for constitutional violations[11] is generally a qualified one, depending on proof that the official acted reasonably and in good faith. Nonetheless, the Court made clear that this general rule does not apply "where it is demonstrated that absolute immunity is essential for the conduct of public business." *Id.* at 507, 98 S.Ct. at 2911. In particular, the Court observed:

> We . . . believe that agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts. The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought.
>
> . . .
>
> The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete. . . .
>
> . . . . .
>
> We believe that agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment.

*Id.* at 515–16, 98 S.Ct. at 2915–2916.

Although the Court in *Economou* emphasized the need to protect decisionmaking *in favor* of initiating or moving forward with proceedings decisions *not* to initiate or move forward clearly must be given the same protection, for to immunize decisions in one

---

**10.** Although plaintiffs claim compensatory and punitive damages in addition to seeking declaratory and injunctive relief, this does not negate the requirement of standing. To be sure, a person suffering actual money damages has an adequate "injury" for standing purposes. Nonetheless, to establish his standing, the complainant must also show that his damages were caused by the governmental conduct that he claims was unlawful. The requirement of causation, which parallels "the redressability aspect of standing," demands that the complainant's injury "fairly can be traced to the challenged action of the defendant." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1975). *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978). A claim of monetary damages cannot establish standing unless this causation/redressability component of the standing requirement is met.

**11.** The Court in *Economou* limited its holding to constitutional claims, 438 U.S. at 495 n.22, 98 S.Ct. at 2905 n.22, although it also addressed claims of an "officer ignor[ing] an express statutory . . . limitation on his authority," *id.* at 489, 98 S.Ct. at 2902. Because I find that even under *Economou* the defendant officials are protected by an absolute immunity, I need not reach the issue of whether certain of plaintiffs' claims are outside the scope of the *Economou* ruling.

direction but not the other would eviscerate the very discretion that the Court sought to protect. As the Government points out, to create a one-sided immunity protecting only decisions to move forward would be to create "an improper bias in decision-making, i. e., prosecutors would be encouraged to act, as opposed to taking no action. Prosecutors must be free to make a decision without being influenced in either direction by fear of liability." Supplemental Brief for Appellees at 7.

To determine whether absolute "prosecutorial" immunity applies, we must focus on the particular conduct and circumstances that gave rise to the claim of liability. See *Tigue v. Swaim*, 585 F.2d 909, 914 (8th Cir. 1978). See also *Forsyth v. Kleindienst*, 599 F.2d 1203, 1212 (3d Cir. 1979). Here, plaintiffs claim damages from the failure of the four individual defendants to terminate federal funding to state and local entities that were allegedly discriminating against plaintiffs. The challenged conduct relates directly to the defendant officials' decision-making concerning whether to move forward with a proceeding to terminate fund-

ing, or, for example, to seek voluntary compliance with the statutory nondiscrimination requirements (perhaps under the threat of termination). In my view, this type of decisionmaking is exactly what the Supreme Court had in mind when it spoke of functions "analogous to those of a prosecutor," *Butz v. Economou*, 438 U.S. at 515, 98 S.Ct. at 2915. See also *Simons v. Bellinger*, (D.C.Cir.1980) (finding members of bar association committee on unauthorized practice of law entitled to absolute immunity).

Contrary to the majority's suggestion, see Maj. Op. at 787, the defendant officials, under the applicable statutory scheme, did not lack the requisite discretion for "prosecutorial" immunity.[12] The key statutory provisions are sections 3766(c)(2) and 3757 of title 42 of the United States Code, 42 U.S.C. §§ 3766(c)(2), 3757 (Supp. V 1975) (amended 1976),[13] as those sections read before Congress enacted amendments in 1976.[14] In concluding that section 3766(c)(2) leaves "virtually no discretion" with the defendant officials, see Maj. Op. at 787 the majority relies on an unduly nar-

12. Although the basic statutory provision concerning the prosecution of federal crimes states that "each United States attorney, within his district, *shall* . . . prosecute for *all* offenses against the United States," 28 U.S.C. § 547 (1976) (emphasis added), no one would seriously contend that United States Attorneys lack discretion in carrying out their prosecutorial functions. See *Newman v. United States*, 382 F.2d 479 (D.C.Cir.1967) (Burger, J.).

13. Section 3766(c)(2) provides:

Whenever the Administration determines that a State government or any unit of general local government has failed to comply with [the nondiscrimination requirements], it shall notify the chief executive of the State of the noncompliance and shall request the chief executive to secure compliance. If within a reasonable time after such notification the chief executive fails or refuses to secure compliance, the Administration shall exercise the powers and functions provided in section 3757 of this title, and is authorized concurrently with such exercise—

(A) to institute an appropriate civil action;

(B) to exercise the powers and functions pursuant to title VI of the Civil Rights Act of 1964 (section 2000d of this title); or

(C) to take such other action as may be provided by law.

42 U.S.C. § 3766(c)(2) (Supp. V 1975) (amended 1976). The "powers and functions provided in section 3757," in turn, are as follows:

Whenever the Administration, after reasonable notice and opportunity for hearing to an applicant or a grantee under this chapter, finds that, with respect to any payments made or to be made under this chapter, there is a substantial failure to comply with—

(a) the provisions of this chapter;

(b) regulations promulgated by the Administration under this chapter; or

(c) a plan or application submitted in accordance with the provisions of this chapter; the Administration shall notify such applicant or grantee that further payments shall not be made (or in its discretion that further payments shall not be made for activities in which there is such failure), until there is no longer such failure.

*Id.* § 3757 (amended 1976).

14. Plaintiffs' claims for damages are based on conduct of the defendant officials before the statute was amended in 1976, and it is thus the pre-amendment version of the statute that is controlling on the damages question. Even as amended in 1976, however, there is still room for some discretion concerning determinations of noncompliance. See H.R.Rep. No. 94–1155, 94th Cong., 2d Sess. 26–27 (1976).

row reading of the statutory language.[15] For section 3766(c)(2) to apply, the appropriate LEAA officials must first "determine" that a governmental unit has violated the nondiscrimination provisions. After such a determination is made, the officials then seek voluntary compliance by the governmental unit with the assistance of the chief executive of the state involved. The LEAA officials must decide when a "reasonable time" has passed after such assistance has been unsuccessfully requested, at which point the officials are directed to exercise the powers and functions provided in section 3757 and are also authorized to take any other appropriate and lawful action to secure compliance. Section 3757

calls for a termination of funding only if there has been a "substantial" failure to comply with the nondiscrimination provisions. Moreover, the officials have express discretion in determining the extent of any cutoff that might be ordered. Indeed, it was congressional dissatisfaction with this discretionary scheme that led to the adoption in 1976 of amendments "to provide a mandatory procedure which the Administration must follow in the event a recipient of LEAA funds is determined to have used those funds for a discriminatory purpose," H.R.Rep. No. 94–1155, 94th Cong., 2d Sess. 25 (1976).[16]

The Supreme Court's language in *Ferri v. Ackerman*, 444 U.S. 193, 100 S.Ct. 402, 62

**15.** Speaking on the floor of the House of Representatives, Representative Jordan described the intended operation of these nondiscrimination provisions:

[W]e now have a provision in the bill which will strengthen civil rights enforcement, a provision in the bill which will not say we cut off the funds if they simply discriminate, but that this Law Enforcement Assistance Administration must adhere to the provisions of title 6 of the Civil Rights Act of 1964, that before any funds are denied any agency or entity in terms of the charge they have discriminated must be entitled to a hearing.

The Governor of the State is the first one who must make the effort to resolve any conflict which will exist. Negotiations, hearings, due process, all is provided for.

119 Cong.Rec. 20,097 (1973).

**16.** In adding the nondiscrimination provisions to the LEAA funding program, Congress obviously intended to continue the funding of criminal justice programs, but without unlawful discrimination. Although a cutoff of funds to one recipient may eventually bring that recipient and others into compliance with the nondiscrimination requirements, *negotiated* compliance, without the need for a cutoff, more directly and immediately achieves the overall congressional goal of "funding without discrimination." Such an overall goal necessarily creates a tension between the desire to continue funding criminal justice programs and the desire to eliminate discrimination, and this tension in turn requires that officials have discretion in implementing these twin congressional policies.

In amending the statute in 1976, Congress recognized that the LEAA had been attempting to secure compliance with the nondiscrimination provisions, but Congress indicated dissatisfaction with the manner in which the LEAA officials had exercised their discretion and

therefore decided to limit that discretion in the future.

The responsibility of LEAA and its failure to enforce aggressively the pertinent civil rights provisions does not emerge . . . as unmistakably clear. There is evidence that LEAA did try to influence the course of the hiring and personnel practices of the offending police departments, but there is also evidence that the influence was not remarkably successful. . . .

It is my view that the argument surrounding LEAA's performance in the area of civil rights is caused by a fundamental difference in the understanding of the purpose and intent of the remedies contained in the civil rights provisions of the act. On the one hand, there are those who believe that the termination provisions of the act, that is—the cutoff of Federal funds—should be used freely when evidence of discrimination is found. On the other hand, there are those who view the LEAA program as one primarily for assistance to State and local criminal justice agencies for use in the long range fight against crime. This latter school of thought holds that fund termination is the most drastic remedy available and should be used sparingly. Because of these differences certain ambiguities have arisen in the determination of how the civil rights provisions of the act should be administered. Therefore, in my view, a clarification of the intent of the Congress is needed to establish just when and how the various procedures contained in the act should be used.

. . . [Under the 1976 amendments,] the duties of LEAA will be clear, and the threat of fund cutoff will be equally as clear to the fund recipients. Hopefully, this amendment will eliminate charges and countercharges of what should have been done in

L.Ed.2d 355 (1979), is equally appropriate in the present context:

> As public servants, the prosecutor and the judge represent the interest of society as a whole. The conduct of their official duties may adversely affect a wide variety of different individuals, each of whom may be a potential source of future controversy. The societal interest in providing such public officials with the maximum ability to deal fearlessly and impartially with the public at large has long been recognized as an acceptable justification for official immunity. The point of immunity for such officials is to forestall an atmosphere of intimidation that would conflict with their resolve to perform their designated functions in a principled fashion.

*Id.* at 202–03, 100 S.Ct. at 408–09 (footnote omitted). By denying absolute immunity to administrators charged with making choices akin to those of a prosecutor, the majority decision is bound to "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties," *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Learned Hand, J.), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950), *quoted in Ferri v. Ackerman*, 444 U.S. at 203 n.20, 100 S.Ct. at 409 n.20.[17] I cannot join such an action.

---

this important area. Thereby the objectives of the act both as to criminal justice funding and nondiscrimination will be accomplished. 122 Cong.Rec. 28,498 (1976) (remarks of Rep. McClory).

Whether the 1976 amendments would affect the ability of LEAA officials to claim absolute immunity for conduct arising after their effective date is a question we need not resolve. *See* note 14 *supra*.

17. As the potential liability of federal officials for constitutional wrongs expands, *see, e. g., Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), it becomes all the more important to safeguard vigorously the discretion of those federal officials whose functions must be especially protected from "the constant dread of retaliation," *Gregoire v. Biddle,*

177 F.2d 579, 581 (2d Cir. 1949) (Learned Hand, J.), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950), *quoted in Ferri v. Ackerman*, 444 U.S. 193, 204 n.20, 100 S.Ct. 402, 409 n.20, 62 L.Ed.2d 355 (1979). *Cf. Dalehite v. United States*, 346 U.S. 15, 57, 73 S.Ct. 956, 979, 97 L.Ed. 1427 (1953) (Jackson, J., dissenting) ("it is not a tort for government to govern"). *See also* K. Davis, Administrative Law Treatise § 26.00–0, at 216 (Spec. Supp.1980) (extent of liability for constitutional torts may be affected by extent of official immunity). For an argument that absolute immunity for all high-ranking executive officials should be reinstated, see Comment, *Qualified Abrogation of Federal Executive Immunity: A Risky Experiment in Judicial Legislation*, 19 S.Tex.L.J. 683 (1978).