NATIONAL BLACK POLICE ASSOCIATION, INC., et al., Appellants,

v.

Richard W. VELDE, et al.

No. 77–1273.

United States Court of Appeals, District of Columbia Circuit.

June 30, 1983.

E. Richard Larson, Isabelle Katz Pinzler, Burt Neuborne, William L. Robinson and Norman J. Chachkin, New York City, were on the supplemental memorandum for appellants.

Robert E. Kopp and Barbara L. Herwig, Attys., Dept. of Justice, Washington, D.C., were on the supplemental memorandum for appellees.

Bennett Boskey, Washington, D.C., was on the supplemental memorandum for appellee, Levi.

Before TAMM, Circuit Judge, BAZELON, Senior Circuit Judge, and PARKER,* United States District Court Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

Dissenting opinion filed by Circuit Judge TAMM.

BAZELON, Senior Circuit Judge:

The Supreme Court vacated and remanded this case[1] for further consideration in light of its recent decision in *Harlow & Butterfield v. Fitzgerald*.[2] The remand requires that we address the following ques-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. —— U.S. ——, 102 S.Ct. 3503, 73 L.Ed.2d 994 (1982).

2. 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

tion:[3] Did appellees have "clearly established" statutory or constitutional duties to terminate federal funds to local law enforcement agencies allegedly known to be discriminating unlawfully on the basis of race and sex? The liability standard announced in *Harlow* entitles appellees to qualified immunity on summary judgment unless such clear duties existed.

Appellants allege that "termination" duties existed under Title VI of the Civil Rights Act of 1964, the Crime Control Act of 1973, and the due process clause of the fifth amendment. We find that such a duty was not clear under Title VI, but that clear duties to terminate funding existed under both the Crime Control Act and the fifth amendment. Accordingly, appellees are entitled to summary judgment with respect to appellants' claims for damages under Title VI, but not for the damage claims under either the Crime Control Act or the fifth amendment.

## BACKGROUND

### Prior Proceedings

Appellants, six blacks and six women, filed this lawsuit on September 4, 1975. They alleged that federal agencies and officials had violated appellants' constitutional and statutory rights by continuing to provide financial assistance to local law enforcement agencies that discriminate on the basis of race and sex. They claimed that this continued funding violated, *inter alia,* Title VI of the Civil Rights Act of 1964 (Title VI),[4] sections 518(c) and 509 of the Crime Control Act of 1973 (the Crime Control Act),[5] and the due process clause of the fifth amendment (fifth amendment). Appellants sought declaratory and injunctive relief against the Law Enforcement Assistance Administration (LEAA),[6] the Department of Justice, and four officials in those agencies. They also sought compensatory and punitive damages against the individual officials for alleged willful and knowing violations of their constitutional and statutory rights.[7]

On December 8, 1976, the district court granted appellees' motion for dismissal.[8] The court held that plaintiffs' claims for declaratory and injunctive relief had "been rendered moot by virtue of the enactment of the Crime Control Act of 1976,"[9] which altered the statutory duties in question.[10] The court also held that appellants' damage claims against the individual officials were "barred by the doctrine of official immunity."[11]

3. Our earlier opinion, *National Black Police Ass'n v. Velde,* 631 F.2d 784 (D.C.Cir.1980), addressed three issues: mootness, standing, and official immunity. Because the mootness and standing issues are unaffected by *Harlow,* we reinstate our earlier opinion with respect to those issues. We note that the termination of the Law Enforcement Assistance Administration since our last opinion may raise new questions concerning mootness with respect to appellants' claims for injunctive and declaratory relief. Because the parties have not addressed this issue in their supplemental briefs, however, we leave it to the district court to decide any mootness issues that may have arisen since our earlier opinion.

4. 42 U.S.C. §§ 2000d–2000d–4 (1976).

5. Pub.L. No. 93–83, §§ 509, 518(c), 87 Stat. 197, 211–12, 214 (amended 1976). The Crime Control Act of 1973 amended provisions of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, title I, 82 Stat. 197

(amended version at 42 U.S.C. §§ 3701–3797 (Supp. V 1981).

6. The LEAA, an agency within the Department of Justice, was created by Congress in 1968 to assist community and citizen groups in their law enforcement and criminal justice activities. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, title I, 82 Stat. 197.

7. Amended Complaint at p. 35, Appendix 38. All references to the Appendix (App.) refer to the appendix filed in *National Black Police Ass'n v. Velde,* 631 F.2d 784 (D.C.Cir.1980).

8. 3 App. 479–80.

9. *Id.* at 479.

10. *See* Pub.L. No. 94–503, § 122(b), 90 Stat. 2407, 2418–21 (1976).

11. 3 App. 480.

The Supreme Court's subsequent decision in *Butz v. Economou*[12] limited the scope of official immunity available to government officials. The Court held that as a general rule, federal officials are entitled only to a qualified immunity in suits alleging constitutional violations. To escape liability, a defendant official must establish a good faith basis and reasonable grounds for his conduct.[13] The Court identified a limited exception to this general rule for administrative officials performing judicial and prosecutorial functions, reasoning that absolute immunity was necessary to protect discretionary prosecutorial decisions from the potentially distorting effect of threats of civil liability.[14]

On appeal of the district court's dismissal of the instant case, appellees argued that their discretion in administering the LEAA funds brought them within the narrowed realm of absolute immunity identified in *Butz*. Based on the mandatory language of the statute and appellees' constitutional duty not to use federal funds in a discriminatory manner, the court found the funding termination provisions to be mandatory, "outside the realm of discretion"[15] and that absolute immunity was therefore inappropriate.[16] Accordingly, the case was remanded for appellants to prove their claims and for appellees to demonstrate the factual basis for a qualified immunity.

Appellees petitioned for review to the Supreme Court and the Court granted certiorari. While the case was pending, the Court decided *Harlow & Butterfield v. Fitzgerald*,[17] which significantly altered the law of official immunity. Shortly thereafter, the Court vacated our judgment in the in-stant case and remanded "for further consideration in light of *Harlow & Butterfield v. Fitzgerald*."[18] We requested the parties to file supplemental briefs on the matter.

## Harlow & Butterfield v. Fitzgerald

*Harlow* substantially altered the standards governing motions for summary judgment in cases involving claims of qualified immunity. However defined, qualified immunity strikes an uneasy balance between two competing concerns: (1) the need to protect individual rights from official abuse, and (2) the need to shield well-meaning officials "from potentially disabling threats of liability."[19] The Court in *Harlow* reiterated that the latter concern requires quick resolution of insubstantial claims against government officials,[20] and noted that the existing qualified immunity standard had not adequately accomplished this objective.

Prior to *Harlow*, summary judgment on questions of qualified immunity generally required both subjective and objective determinations. Summary judgment was denied if there was a factual dispute about whether an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury ...."[21] By alleging that an official acted with malicious intent or with a belief that a clear standard prohibited such conduct, plaintiffs could create a factual dispute that frequently required a subjective determina-

---

**12.** 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

**13.** *Id.* at 507, 98 S.Ct. at 2911. *Accord Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974).

**14.** 438 U.S. at 512–17, 98 S.Ct. at 2913–16.

**15.** 631 F.2d at 787 n. 15.

**16.** The Court also reversed the district court's decision that the case was moot and rejected appellees' argument that appellants lacked standing. *Id.* at 787.

**17.** 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**18.** —— U.S. ——, 102 S.Ct. 3503, 73 L.Ed.2d 994 (1982).

**19.** 102 S.Ct. at 2732.

**20.** *Id.* 102 S.Ct. at 2737. *See Butz v. Economou,* 438 U.S. 478, 507–08, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).

**21.** *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).

tion necessitating a trial. The need for such determinations thus frustrated the goal of terminating insubstantial lawsuits on summary judgment.[22]

■ *Harlow* adjusted the summary judgment standard to make it rely on objective factors. Under the new standard, "government officials performing discretionary functions generally·are shielded from liability for civil damages insofar as their conduct does not violate *clearly established statutory or constitutional rights* of which a reasonable person would have known." [23] On summary judgment, a court must first determine whether the rights allegedly violated were clearly established in the law.[24] That determination is purely legal. If the court finds that the rights were clearly established, and that there is a genuine dispute over material facts, summary judgment must be denied. In subsequent proceedings, a defendant can still obtain qualified immunity by showing that because of "extraordinary circumstances" he neither knew nor should have known that his conduct was unlawful.[25]

Applying this standard to the instant case,[26] we must determine whether appellees' failure to terminate funding to local law enforcement agencies violated statutory or constitutional duties clearly established at the time the failure occurred. We find that appellants' allegations, judged in their most favorable light, allege violations of statutory and constitutional rights which were clearly established at the time they allegedly occurred. Summary judgment is therefore denied.[27]

### ANALYSIS

*Application of the* Harlow *Standard*

Appellants contend that appellees' failure to terminate funding to discriminatory agencies violated clear duties imposed on them by three independent sources of law.[28] We consider each of these sources in turn.

*Title VI*

■ Section 601 of Title VI prohibits recipients of federal financial assistance from engaging in racial discrimination:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.[29]

The Act also prescribes measures to be taken by federal funding agencies against recipients who disregard this prohibition.[30] Of particular relevance is 42 U.S.C. § 2000d–1:

Compliance with any requirement adopted pursuant to this section may be effected (1) *by the termination of or refusal to grant or to continue assistance* under

---

**22.** The court noted, 102 S.Ct. at 2737–38, that several courts have considered an official's subjective good faith as inherently requiring resolution by a jury. *E.g., Landrum v. Moats,* 576 F.2d 1320, 1329 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978); *Duchesne v. Sugarman,* 566 F.2d 817, 832–33 (2d Cir.1977).

**23.** 102 S.Ct. at 2738 (emphasis added).

**24.** *Id.* 102 S.Ct. at 2739.

**25.** *Id.*

**26.** This case is technically before us on the district court's grant of a motion to dismiss. We adhere to our earlier position that absolute immunity is inappropriate and that the dismissal is to be reversed. However, because in the district court appellants had moved in the alternative for summary judgment, and because

they argue that they are entitled to summary judgment as a matter of law, we will reach the question of whether summary judgment is appropriate.

**27.** The district court has not yet ruled whether appellants' complaint states a claim upon which relief can be granted. We did not address this issue in our first opinion, and the issue has not been briefed for us. We therefore do not view the issue as properly presented for our decision in the present posture of this case.

**28.** Appellants have not argued that Congress has in any way altered the common law standards for immunity with respect to the causes of action alleged in this case.

**29.** 42 U.S.C. § 2000d (1976).

**30.** 42 U.S.C. § 2000d–1 to 2000d–4 (1976).

such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, . . . or (2) *by any other means authorized by law.*

(emphasis added). Appellants contend that this provision imposed on appellees a clear duty to terminate funds to agencies that unlawfully discriminate.

On its face, however, the statutory language is not mandatory. Section 2000d–1 allows the funding agency to effect compliance through funding termination or "any other means authorized by law." Although fund termination was envisioned as the primary means of enforcement under Title VI,[31] and although it has proven very effective as a deterrent to discrimination,[32] Title VI clearly tolerates other enforcement schemes. Prominent among these other means of enforcement is referral of cases to the Attorney General, who may bring an action against the recipient.[33] The choice of enforcement methods was intended to allow funding agencies flexibility in responding to instances of discrimination.[34]

**31.** *See Hearings on Miscellaneous Proposals Regarding the Civil Rights of Persons within the Jurisdiction of the United States Before Subcomm. No. 5 of the House Comm. on the Judiciary,* 88th Cong., 1st Sess. 1544 (1963) (testimony of Sec'y Celebrezze, HEW); *id.* at 1786–88 (testimony of George Meany, AFL–CIO); *id.* at 1890–91 (testimony of Joseph Rauh, ADA); *id.* at 2161 (testimony of Roy Wilkins, NAACP) [hereinafter referred to as *Subcommittee Hearings*]. The wording of Title VI indicates a preference for the fund cutoff remedy. Not only is fund termination mentioned first, but it is the only sanction specifically named. 42 U.S.C. § 2000d–1 (1976). The preference for fund termination under Title VI is noted in, *e.g., United States v. Jefferson County Bd. of Educ.,* 372 F.2d 836, 853 (5th Cir.1966) ("Congress was dissatisfied with the slow progress inherent in the judicial adversary process . . . . [and] therefore fashioned a new method of enforcement."); REPORT OF THE WHITE HOUSE CONFERENCE, TO FULFILL THESE RIGHTS 63 (1966) ("administrative proceedings prescribed by Congress as the primary device of enforcing Title VI"); VI UNITED STATES COMMISSION ON CIVIL RIGHTS, THE FEDERAL CIVIL RIGHTS ENFORCEMENT EFFORT—1974 22–24, 386–88 [hereinafter cited without cross-reference as VI COMMISSION REPORT —1974]; Comment, *Title VI of the Civil Rights Act of 1964—Implementation and Impact,* 36 GEO.WASH.L.REV. 824, 827 (1968); *Notre Dame Conference on Federal Civil Rights Legislation and Administration: A Report,* 41 NOTRE DAME LAW 906, 922–24 (1966).

**32.** Early use of the sanction by HEW is instructive. Between July, 1964 and March, 1970, HEW initiated approximately 600 administrative proceedings against school districts found not to be in compliance with section 601 standards. In 400 of these cases, HEW found that the districts came into compliance following threat of termination, with no need for actual termination. Among the 200 cases in which funds were actually cut off, HEW subsequently determined that compliance had been achieved, and federal assistance was resumed in all but 4 districts. VI COMMISSION REPORT—1974, at 384–85. *See Adams v. Richardson,* 480 F.2d 1159, 1163 n. 4 (D.C.Cir.1973) (en banc); Tomlinson & Mashaw, *The Enforcement of Federal Standards in Grant-in-Aid Programs: Suggestions for Beneficiary Involvement,* 58 VA.L.REV. 600, 619 (1972); Comment, *supra* note 31, at 871.

**33.** H.R.REP. No. 914, 88th Cong., 1st Sess. 86 (1963), U.S.Code Cong. & Admin.News 1964, 2355. *See* Guidelines for the Enforcement of Title VI, Civil Rights Act of 1964, 28 C.F.R. § 50.3 (1982). The Guidelines also suggest a number of administrative alternatives to funding termination. *Id.*

**34.** *Subcommittee Hearings, supra* note 31, at 1381–82 (testimony of Att'y Gen. Kennedy), 1544 (testimony of Sec'y Celebrezze, HEW), 1890 (statement of Rep. Celler); 110 CONG.REC. 2467 (1964) (statement of Rep. Gill).

The grant of a choice of remedies was also an attempt to accommodate competing views. Some civil rights advocates felt that funding termination should be mandatory. They saw in the relatively unbridled discretion of the agencies the potential for its abuse by a program-oriented bureaucracy or an inactive administration. *See, e.g., Subcommittee Hearings, supra,* at 2093–94 (testimony of Sidney Zagri, Teamsters Union), 2352 (statement of Rep. Halpern). As Roy Wilkins, Executive Secretary of the NAACP, explained:

[W]e always shy away from "discretionary" in these areas. We feel that unless [funding termination] is made mandatory, all sorts of discretion will be exercised and until it is demonstrated in good faith that discretion means discretion and does not mean discrimination, then we would want mandatory phraseology in there.

*Id.* at 2161. Others opposed the funding termination remedy either on the grounds that it would jeopardize minority-oriented programs or that it would be an unwise or unconstitutional assumption of power by the executive. *See* 110 CONG.REC. 2466 (1964) (statement of

Faced with this statutory discretion, we cannot say that appellees' failure to terminate funding violated a clearly established statutory duty under Title VI.

Adams v. Richardson,[35] on which appellants rely heavily, does not establish clear law to the contrary. In that case, officials of the Department of Health, Education, and Welfare (HEW) insisted that enforcement of Title VI was entirely committed to agency discretion and that an agency's decision to rely on voluntary compliance was therefore unreviewable in the courts. The court rejected that contention, but did not suggest that termination was the *only* available means for securing compliance. The court noted that "[t]he Act sets forth two alternative causes of action by which enforcement may be effected,"[36] and that a failed request for voluntary compliance "does not relieve the agency of the responsibility to enforce Title VI by one of the two alternative means contemplated by the statute."[37] Thus, while *Adams* makes it

clear that federal funding agencies must do *something* to effect compliance, it did not clearly establish that funding termination was required.[38]

■ In holding that appellees' failure to terminate funding did not violate clearly established duties under Title VI, we do not imply that appellees have complied with that statute. Appellants' allegations concerning appellees' efforts to enforce their civil rights mandate paint a less than exemplary picture.[39] Compliance with Title VI might well have required appellees to pursue compliance more vigorously than they did, and injunctive relief may have been appropriate. But Title VI has been criticized as ineffective in securing civil rights, and such ineffectiveness has been attributed to the discretion in the statute precisely where appellants claim that there is none.[40] Because of that discretion, it was not clear that Title VI duties would be violated by a failure to terminate funds.

Rep. Elliott); *id.* at 6527 (statement of Sen. Holland); *Subcommittee Hearings, supra* note 31, at 1583 (statement of Rep. Dorn); H.R.REP. No. 914, 88th Cong., 1st Sess. 64, 86 (1963).

**35.** 480 F.2d 1159 (D.C.Cir.1973) (en banc).

**36.** *Id.* at 1163.

**37.** *Id.*

**38.** Appellants cite several other cases from different circuits in support of their position. *Gautreaux v. Romney,* 448 F.2d 731 (7th Cir. 1971), is perhaps closest on point. In that case, however, the precise question was whether the federal funding agency's "knowing acquiescence in [an] admitted discriminatory housing program violated either the Due Process Clause of the Fifth Amendment or Section 601 of the Civil Rights Act of 1964." Although the court made clear that violations of both sources of law had occurred, it did not make clear whether the agency's Title VI obligations could have been satisfied by a vigorous enforcement scheme that stopped short of fund termination.

**39.** If true, the picture is not unlike the disappointing civil rights efforts of several other federal agencies. The antipathy with which the federal bureaucracy has viewed Title VI has been documented by the Civil Rights Commission:

The enforcement failure was the result, to a large extent, of placing the responsibility for

ensuring racial and ethnic justice upon a massive Federal bureaucracy which for years had been an integral part of a discriminatory system. Not only did the bureaucrats resist civil rights goals; they often viewed any meaningful effort to pursue them to be against their particular program's self-interest.

UNITED STATES COMMISSION ON CIVIL RIGHTS, THE FEDERAL CIVIL RIGHTS ENFORCEMENT EFFORT—A REASSESSMENT 7 (1973) [hereinafter cited as COMMISSION REPORT—1973]. *See* UNITED STATES COMMISSION ON CIVIL RIGHTS, THE FEDERAL CIVIL RIGHTS ENFORCEMENT EFFORT 1091–92 (1970) [hereinafter cited as COMMISSION REPORT—1970]; Tomlinson & Mashaw, *supra* note 32, at 619.

The Department of Justice Guidelines for the Enforcement of Title VI, Civil Rights Act of 1964, 28 C.F.R. § 50.3 (1982), issued in 1965, suggested alternative judicial and administrative means of enforcement and authorized fund termination only where those alternatives would be ineffective or inappropriate. The Civil Rights Commission found that every agency it examined in 1974 had failed to cut off funds in cases where termination would have been the appropriate means of enforcement. VI COMMISSION REPORT—1974, at 653, 762–97. *See Adams v. Weinberger,* 391 F.Supp. 269, 271 (D.D.C.1975).

**40.** *See,* Note, *Enforcing a Congressional Mandate: LEAA and Civil Rights,* 85 YALE L.J. 720, 723–28 (1976).

Appellees are therefore entitled to qualified immunity for any suit based on Title VI arising out of their failure to terminate funds.

*The Crime Control Act*

The broad discretion over enforcement methods provided by Title VI is in sharp contrast to the mandatory language of the Crime Control Act. Section 518(c)(2) of the Act stated:

> Whenever the Administration [LEAA] determines that a State government or any unit of general local government has failed to comply with [the nondiscrimination requirements], it *shall* notify the chief executive of the State of the noncompliance and *shall* request the chief executive to secure compliance. If within a reasonable time after such notification the chief executive fails or refuses to secure compliance, the Administration *shall* exercise [its funding termination powers],[41] and is authorized concurrently with such exercise—
>
> (A) to institute an appropriate civil action;

(B) to exercise the powers and functions pursuant to title VI of the Civil Rights Act of 1964 (section 2000d of this title); or

(C) to take such other action as may be provided by law.[42]

Congress enacted this statutory command in 1973, when it reviewed LEAA's initial grant of funds. In reviewing LEAA's civil rights enforcement efforts, Congress was struck by the agency's failure to follow the spirit of Title VI.[43] The number of the agency's staff assigned to civil rights was criticized as entirely inadequate.[44] Although LEAA had received numerous complaints of discrimination by recipients, it had *never* applied any sanctions and had *never* held a compliance hearing.[45] Indeed, LEAA had *never* even promulgated procedures for such a hearing.[46] Justice Department regulations governing LEAA expressed a preference for enforcement through judicial proceedings rather than fund termination,[47] yet LEAA had apparently never referred a case to the Attorney

---

**41.** More precisely, the statute requires the Administration to exercise "the powers and functions provided in section 509 of this title," which states that

> Whenever the Administration, after reasonable notice and opportunity for hearing to an applicant or a grantee under this chapter, finds that, with respect to any payments made or to be made under this chapter, there is a substantial failure to comply with—
> (a) the provisions of this chapter;
> (b) regulations promulgated by the Administration under this chapter; or
> (c) a plan or application submitted in accordance with the provisions of this chapter; the Administration *shall* notify such applicant or grantee that further payments *shall* not be made (or in its discretion that further payments *shall* not be made for activities in which there is such failure), until there is no longer such failure.

42 U.S.C. § 3757 (Supp. V 1975) (current version at 42 U.S.C. § 3783 (Supp. V 1981)) (emphasis added).

**42.** 42 U.S.C. § 3766(c)(2) (Supp. V 1975) (amended 1976) (emphasis added).

**43.** *See Hearings on the Law Enforcement Assistance Administration Before Subcomm. No.* 5 of the House Comm. on the Judiciary, 93d Cong., 1st Sess. 345 (1973) (statement of Sarah Carey) [hereinafter cited as *LEAA Hearings*]; 3 Lawyers Committee for Civil Rights Under Law, Law and Disorder 32–36 (1973); 119 Cong.Rec. 20,070–71 (1973) (statement of Rep. Jordan).

**44.** Until 1971, LEAA had no civil rights office responsible for implementing its Title VI regulations; once established, the office was understaffed. *See* Commission Report—1973, *supra* note 39, at 97; Commission Report—1970, *supra* note 39, at 601, 634.

**45.** *See* Commission Report—1973, *supra* note 39, at 100–01.

**46.** *See id.* at 100 n. 27.

**47.** 28 C.F.R. § 42.206(a) (1975) provided: "[W]here the responsible department official determines that judicial proceedings ... are as likely or more likely to result in compliance than administrative proceedings ..., he shall invoke the judicial remedy rather than the administrative remedy." In 1973, the Civil Rights Commission concluded that "LEAA has administratively repealed the remedy of fund cutoff." Commission Report—1973, *supra* note 39, at 101 n. 36.

General, and only rarely had intervened in private suits.[48]

Against this background, Congress created a set of more stringent enforcement requirements addressed specifically to LEAA's civil rights obligation.[49] Congress explicitly rejected President Nixon's version of the bill, which merely stated that Title VI applies to LEAA.[50] Instead, Congress adopted sections 509 and 518(c)(2), which outlined a mandatory enforcement scheme that relies on funding termination. By doing so, Congress explicitly prevented LEAA from relying on the Title VI option of "any other means authorized by law."

Representative Jordan, originator of the mandatory provision,[51] described her amendment to the Act as follows:

The effect of my amendment ... is to *require* LEAA *to first* use the same enforcement procedure which applies to any other violation of LEAA regulations or statutes. That procedure of notification hearings and negotiations is spelled out in section 509, which provides the ultimate sanction of funding cutoff if compliance is not obtained.

This amendment was necessary to *reverse* LEAA's traditional reliance on court proceedings to correct discrimina-

tion, rather than undertaking administrative enforcement of civil rights requirements.[52]

■ Despite this statutory language and legislative history, appellees argue that the Crime Control Act provided them "broad enforcement discretion." Although their position is clearly exaggerated, some limited discretion under the statute does exist. Thus, LEAA must "determine" whether a recipient of LEAA funding has failed to comply with the statute's nondiscrimination provision and LEAA regulations. After notifying the recipient state's governor of the noncompliance, LEAA has to determine whether the governor has secured compliance "within a reasonable time." The administrator must then determine whether failure to comply is substantial, at which point some form of fund termination is mandatory.

These limited areas of discretion do not, however, render appellees' statutory obligation so unclear as to entitle them to qualified immunity as a matter of law. Appellants have alleged, with some support, that rampant discrimination existed among recipients of LEAA funds. Many recipient agencies were involved in lawsuits alleging

---

**48.** 119 Cong.Rec. 20,071 (1973) (statement of Rep. Jordan). In two of the suits, *Morrow v. Crisler*, 491 F.2d 1053 (5th Cir.) (en banc), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974), and *Castro v. Beecher*, 459 F.2d 725 (1st Cir.1972), LEAA intervened ten months and eight months after the suits were brought and only "as a result of a great amount of external pressure ... to take some action." United States Commission on Civil Rights, The Federal Civil Rights Enforcement Effort: One Year Later 147 (1971). In the third case, intervention was by court order. 3 Lawyers Committee for Civil Rights Under Law, *supra* note 43, at 36.

**49.** Crime Control Act of 1973, Pub.L. No. 93–83, § 2, 87 Stat. 197, 211–2, 214 (amended 1976).

**50.** *LEAA Hearings, supra* note 43, at 26 (text of Administration bill, S. 1234, 93d Cong., 1st Sess. § 308(b)(2) (1973)).

**51.** Her original amendment made two major changes: it imposed a 60-day time limit on

voluntary compliance efforts, after which enforcement action was required, and it replaced the discretionary choice of sanctions permitted under Title VI with mandatory fund termination. Concurrent with termination, the agency could use other enumerated means in its efforts to obtain compliance. 119 Cong.Rec. 20,071 (1973) (statement of Rep. Jordan). The Jordan version passed the House, *id.* at 20,105, but was revised in the conference committee to accommodate the views of the Senate, which had approved the President's proposal. The statute which emerged provided for mandatory termination after a "reasonable time" rather than after 60 days, but retained the requirement that, in the words of the conference committee, "LEAA *must* initiate proceedings to cut off funds to any recipient who continues to discriminate after that period, and may, concurrently with that initiation, take other actions." Senate Conf.Rep. No. 349, 93d Cong., 1st Sess. 32 (1973), U.S.Code Cong. & Admin.News 1973, 1729 (emphasis added).

**52.** 119 Cong.Rec. 20,071 (1973) (emphasis added).

unlawful discrimination.[53] Other recipients reportedly pursued policies that constituted prima facie evidence of discrimination.[54] The few compliance investigations conducted by LEAA allegedly turned up widespread noncompliance.[55] If such allegations are true, LEAA's obligations were clear under the 1973 amendments to the Act. Notification of the state's governor was required, and funding termination proceedings were to be instituted in cases where voluntary compliance failed. Appellants have alleged that very few (perhaps only one) notices to governors were sent, and that funding termination proceedings were never brought prior to commencement of the instant suit. In the words of the House Committee on the Judiciary, "LEAA has never terminated payment of funds to any recipient because of a civil rights violation. Despite positive findings of discrimination by courts and administrative agencies, LEAA has continued to fund violators of the Act." [56]

Significantly, appellants' allegations of bad faith do not principally involve appellees' exercise of judgment in those areas where appellees contend the Act is ambiguous. Appellants' claims are not based on either appellees' application of the "reasonable time" allowance for effecting volun-tary compliance, or the "substantial failure" determination that ultimately makes termination mandatory. Rather, the allegations involve principally the failure of LEAA officials to notify the governors of states where recipients were discriminating, and to institute administrative funding termination proceedings where they had determined that voluntary efforts would not succeed. The purpose of qualified immunity is to protect officials from liability where ambiguity in the law prevents them from knowing how properly to carry out their duties. We do not see how such ambiguity affected the appellees in this case.

■ It is true, of course, that the enforcement procedures of 518(c)(2) only begin "[w]henever the Administration [LEAA] determines" that a failure to comply exists. This language does not mean, however, that LEAA could avoid its enforcement obligations by refusing to "determine" that noncompliance existed. It is one thing for an agency to proceed cautiously because of the possible consequences of terminating funds. It is something quite different to abdicate the civil rights enforcement role that Congress clearly intended LEAA to play. Appellants have alleged and provided some support showing that

---

53. "[O]f the 50 largest police departments receiving LEAA funds, 26 were parties to [lawsuits alleging discriminatory practices]." *See* VI COMMISSION REPORT—1974, at 380.

54. *See id.* at 377–78.

55. "LEAA staff have stated that the majority of LEAA recipients it has reviewed were found to engage in some form of discriminatory practice." *Id.* at 361 n. 968.

56. Report of the House Committee on the Judiciary, H.R.REP. No. 1155, 94th Cong., 2d Sess. 11 (1976). Moreover, in a limited number of cases, LEAA did refer cases to the Justice Department. VI COMMISSION REPORT—1974, at 383. It is unclear on what basis such action would have been taken unless LEAA believed the recipient was out of compliance. The statute and congressional intent were explicit that, in such circumstances, referral to the Justice Department was to be concurrent with the initiation of fund termination proceedings.

This set of circumstances is presented most clearly with respect to the Philadelphia Police Department. On Feb. 1, 1974, appellee Herbert Rice, Director of LEAA's Office of Civil Rights Compliance, sent the Philadelphia Police Commissioner a mailgram, which stated:

THIS WILL ALSO FORMERLY [sic] ADVISE YOU THAT LEAA HAS DETERMINED THAT THE PHILADELPHIA POLICE DEPARTMENT HAS FAILED TO COMPLY WITH [THE NONDISCRIMINATION REGULATIONS]. THE LEAA HAS FURTHER DETERMINED THAT COMPLIANCE WITH THE REGULATIONS CANNOT BE ACHIEVED BY VOLUNTARY MEANS. ACCORDINGLY, THIS MATTER HAS BEEN REFERRED TO THE CIVIL RIGHTS DIVISION OF THE DEPARTMENT OF JUSTICE FOR CONSIDERATION OF THE INSTITUTION OF APPROPRIATE LEGAL PROCEEDINGS.

App. 91. Appellees have not offered a satisfactory explanation for why, in light of the language of § 518(c)(2), funding termination proceedings were not instituted concurrent with the referral of the case to the Justice Department.

unlawful discrimination among funded agencies was rampant and that LEAA officials were aware of that fact. A wholesale refusal to make the determinations clearly contemplated by the Act might well defeat a claim of good faith.

### The Fifth Amendment

[7, 8] In addition to any statutory duties appellees may have had, appellants assert that appellees had a constitutional duty not to fund local law enforcement agencies known to be discriminating. Appellants derive this duty from the due process clause of the fifth amendment, which makes applicable to the federal government the equal protection limitations that the fourteenth amendment places on the actions of states. Although appellants will have the burden of establishing several difficult issues of fact,[57] it is a clearly established principle of constitutional law that the federal government may not fund local agencies known to be unconstitutionally discriminating.

■■■ Equal protection principles bar federal officials, like state officials, from engaging in racial discrimination.[58] This constitutional obligation applies not just to direct involvement, but also to government "support" of discrimination "through any arrangement, management, funds or prop-

erty."[59] Activities that the federal government could not constitutionally participate in directly cannot be supported indirectly through the provision of support for other persons engaged in such activity.[60] This prohibition encompasses various forms of support that are much less direct than the funding involved in this case.[61]

■■■ Appellants contend that because their purpose in funding law enforcement agencies is the constitutionally permissible goal of promoting law enforcement, the fact that recipients of their funds discriminate does not make the funding itself unconstitutional. It is clear, however, that a government entity may not fund a discriminating entity simply because the government's purpose is benevolent. In *Norwood v. Harrison*,[62] a case examining the constitutionality of a state providing free textbooks to private schools that practice racial discrimination, the Court emphatically stated, "good intentions as to one valid objective do not serve to negate the State's involvement in violation of a constitutional duty."[63]

Appellants suggest that these firm constitutional principles, reiterated in *Norwood*, were tacitly changed by the Supreme Court opinions in *Personnel Administrator of Mas-*

57. *See infra* p. 583 & note 77.

58. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

59. *Cooper v. Aaron*, 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5, 19 (1958). *See Norwood v. Harrison*, 413 U.S. 455, 467, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723 (1973).

60. *Norwood v. Harrison*, 413 U.S. 455, 465, 93 S.Ct. 2804, 2810, 37 L.Ed.2d 723 (1973).

61. Many forms of support have been found unconstitutional in the frequently litigated field of government involvement with segregated schools. *See id.* (free textbooks for racially discriminating private schools); *Brown v. South Carolina State Bd. of Educ.*, 296 F.Supp. 199 (D.S.C.), *aff'd*, 393 U.S. 222, 89 S.Ct. 449, 21 L.Ed.2d 391 (1968) (state tuition grants to students attending racially discriminatory schools); *Poindexter v. Louisiana Fin. Assistance Comm'n*, 275 F.Supp. 833 (E.D.La.1967), *aff'd*, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 80

(1968) (same); *Lee v. Macon County Bd. of Educ.*, 267 F.Supp. 458, 475–78 (M.D.Ala.) (same), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967); *cf. Green v. Connally*, 330 F.Supp. 1150, 1164–65 (D.D.C.), *aff'd sub nom. Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971) (tax exemptions to discriminatory private schools).

As the Court pointed out in *Norwood*, however, equal protection principles do not prohibit the provision of *all* forms of government services provided to discriminatory institutions. 413 U.S. at 465, 93 S.Ct. at 2810. For example, the Constitution does not prohibit the provision of generalized services over which the state has an operating monopoly, such as electricity, water, and police and fire protection. *Id.; Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972).

62. 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973).

63. *Id.* at 466, 93 S.Ct. at 2811.

sachusetts v. Feeney,[64] and *Washington v. Davis.*[65] These cases held that government action that has only a discriminatory effect does not constitute a violation of equal protection guarantees. To establish such a violation, it must also be shown that the government action had an invidiously discriminatory purpose. Appellees contend that the holdings in these cases make it constitutionally permissible for the federal government to fund discriminating agencies so long as the federal government's purpose is not the furtherance of discrimination.[66]

*Feeney* and *Davis* addressed completely different issues from the one addressed in *Norwood,* and we do not accept the contention that they implicitly overruled the longstanding principles on which *Norwood* is based. *Feeney* and *Davis* both involved facially neutral government practices that allegedly had a disparate impact on Blacks (*Davis*) and women (*Feeney*).[67] The issues presented were whether disparate impact alone could render unconstitutional a government practice that is neutral on its face. The Court found that such practices were not unconstitutional.

In contrast, *Norwood* is just a recent example of a long line of cases concerning the constitutionality of government involvement in practices which the fifth and fourteenth amendments prohibit the government from engaging in directly.[68] The proper inquiry is whether the relationship between the government and the activity in question is of such nature that the activity will be treated as an action of the government. If so, the issue is whether the government could directly engage in the activity consistent with the Constitution. If not, the government involvement is unconstitutional, regardless of its purpose.[69] We do not suppose that the Supreme Court implicitly changed these firm principles *sub silentio* in *Feeney* and *Davis.*[70]

**64.** 442 U.S. 256, 273–81, 99 S.Ct. 2282, 2293–97, 60 L.Ed.2d 870 (1979).

**65.** 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976).

**66.** Cf. *Bob Jones University v. United States,* —— U.S. ——, —— n. 4, 103 S.Ct. 2017, 2022 n. 4, 76 L.Ed.2d 157 (1983) (Rehnquist, J. dissenting) (tax exemption of racially discriminatory schools under facially neutral statute granting general exemption to schools is permissible, absent invidiously discriminatory purpose). It is unclear whether Justice Rehnquist, in his lone dissent, premises his conclusion on the view that tax exemptions are not state action. *See Walz v. Tax Comm'n,* 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). If, however, Justice Rehnquist intends to extend this principle to clear instances of active state involvement with purposive discriminators, then a number of well-established precedents would have to be overruled. *See, e.g., Gilmore v. City of Montgomery,* 417 U.S. 556, 573–74, 94 S.Ct. 2416, 2426, 41 L.Ed.2d 304 (1974); *Norwood v. Harrison,* 413 U.S. 455, 466–67, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723 (1973); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 721–22, 81 S.Ct. 856, 859–60, 6 L.Ed.2d 45 (1961); *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5, 19 (1958). See infra pp. 581–582.

**67.** *Davis* involved a written examination administered to applicants for positions in the District of Columbia Police Department. The examination excluded a disproportionate number of Black applicants. 426 U.S. at 234–36, 96 S.Ct. at 2045. *Feeney* involved a Massachusetts statute which gave qualified veterans an absolute preference over qualified nonveterans in state civil service positions. The statute had an overwhelmingly negative impact on civil service opportunities for women because so few women at the time were veterans. 442 U.S. at 259, 99 S.Ct. at 2285.

**68.** *See, e.g., Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 721–22, 81 S.Ct. 856, 859–60, 6 L.Ed.2d 45 (1961); *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5, 19 (1958).

**69.** In *Norwood,* for example, the Court pointed out that the district court found that the free textbook program had been established in 1940, long before *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), had found segregated schools unconstitutional. From this fact, the Supreme Court's analysis proceeded on the assumption that the program was not motivated by an illegally discriminatory purpose.

**70.** Appellees' reading of *Feeney* and *Davis* has rather startling implications. It would seem, for example, that their interpretation would allow the federal government to fund directly segregated schools as long as the purpose for doing so was educational rather than discriminatory.

■ The distinction between *Feeney* and *Davis* and *Norwood* can be illustrated with reference to the instant case. Appellants allege that agencies receiving LEAA funds practiced unconstitutional discrimination. *Feeney* and *Davis* make clear that for such to be true, the discrimination must be purposeful. If such discrimination does exist, however, the issue then becomes whether funding is a form of involvement that requires us to impute the actions and motives of the local agencies to the federal government. Although some forms of government involvement are sufficiently indirect and complex that they require a careful balancing of factors,[71] the constitutional prohibition on intentional discrimination clearly prohibits the government from funding other agencies engaged in such practices.[72]

■ A constitutional violation, moreover, does not arise only when it can be shown that discrimination would not have occurred in the absence of federal funds. As the Court in *Norwood* stated about aid to racially segregated schools, "the Constitution does not permit the state to aid discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school."[73] Thus, in order to establish that a violation has occurred, appellants need not show that a particular instance of discrimination would not have occurred in the absence of federal funding.[74] Such a showing may be relevant in calculating damages, if any, but not to the initial question of whether a violation has occurred.

■ In stating these principles, two important clarifications are in order. First, the equal protection principles embodied in the fifth amendment only prohibit federal funding of *unconstitutional* discrimination. Statutory and regulatory schemes may prohibit various forms of discrimination that are not constitutionally prohibited.[75] To the extent that appellees' duty to terminate funds is based on constitutional equal protection guarantees, that duty only extends to the funding of local agencies engaged in unconstitutional discrimination.

■ Second, appellees' clearly established duty to terminate funds only existed with respect to recipients that appellees *knew or should have known*[76] were en-

---

**71.** *See, e.g., Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974) (use by segregated private schools of public recreational facilities); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (discrimination by private restaurant in publicly owned facility).

**72.** *See, e.g., Gautreaux v. Romney,* 448 F.2d 731 (7th Cir.1971) (federal funding of discriminatory housing program violates due process); *Green v. Connally,* 330 F.Supp. 1150, 1164–65 (D.D.C.) (Leventhal, J.) ("Clearly the Federal Government could not under the Constitution give direct financial aid to [institutions] practicing racial discrimination."), *aff'd sub nom. Coit v. Green,* 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971).

**73.** The district court in that case had stressed the absence of a showing that "any child enrolled in private school, if deprived of free textbooks, would withdraw from private school and subsequently enroll in the public schools." 340 F.Supp. 1003, 1013 (1972). The Court found that fact irrelevant in deciding whether a violation had occurred. 413 U.S. at 465, 93 S.Ct. at 2810 (1972).

**74.** In this regard we note, however, the successful experience of some other agencies, particularly HEW, in using fund termination as a method of obtaining compliance. *See Adams v. Richardson,* 480 F.2d 1159, 1163 n. 4 (D.C. Cir.1973) (en banc).

**75.** *See, e.g., Washington v. Davis,* 426 U.S. 229, 238–39, 96 S.Ct. 2040, 2046–47, 48 L.Ed.2d 597 (legal standards governing discrimination under Title VII of Civil Rights Act of 1964 are not the same as under fifth amendment).

**76.** There is some suggestion in various cases that the fifth amendment imposes a duty on federal officials to police actively recipients of federal funds to ensure that they are not practicing discrimination. *See, e.g., NAACP, Western Region v. Brennan,* 360 F.Supp. 1006, 1012 (D.D.C.1973) ("the Fifth Amendment impose[s] upon federal officials not only the duty to refrain from participating in discriminatory practices, but the affirmative duty to police the operations of and prevent such discrimination by State and local agencies funded by them.") We take no position on the existence or extent of any such duty because we conclude that the nature of any such duty is not clearly estab-

gaged in ongoing unconstitutional discrimination.[77] Such a knowledge requirement is consistent with the purpose of qualified immunity, which is to protect government officials whose limited knowledge prevents them from conducting their duties without committing occasional honest mistakes. The appropriate inquiry involves both a subjective and objective examination of the extent of appellees' knowledge. Such a subjective inquiry is not inconsistent with *Harlow,* which only precludes a subjective inquiry prior to finding that the state of the law allegedly violated was clear. Appellants can use whatever evidence is available through discovery to establish that appellees knew a particular recipient of funds was unconstitutionally discriminating.

### Conclusion

Under the *Harlow* standard, appellees are entitled to summary judgment regarding appellants' claims for damages under Title VI. With respect to the damage claims under the Crime Control Act and the fifth amendment, however, appellants have alleged violations of "clearly established statutory and constitutional rights." For that reason, we adhere to our rejection of appellees' claim of qualified immunity at this stage of the proceeding. The case is remanded to the district court for further proceedings.

*So ordered.*

TAMM, Circuit Judge, dissenting:

For the reasons stated in my prior dissenting opinion in this case, 631 F.2d at 791–94, I would hold that the individual defendants are protected by absolute immunity. Accordingly, I respectfully dissent from the majority opinion. Because the *Harlow* standard for qualified immunity does not affect my position on the defendant's absolute immunity, I need not discuss *Harlow.*

---

lished. We note, however, that the absence of a clear duty to investigate affirmatively does not protect individuals for actions displaying deliberate indifference to constitutional rights. *See Carlson v. Green,* 446 U.S. 14, 15, 16–17, 100 S.Ct. 1468, 1469, 1470, 64 L.Ed.2d 15 (1980); *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

77. This issue is, of course, simplified in cases where it is accepted that the activity receiving government support could not be practiced directly by the federal government (*e.g.,* segregated schools). The issue is much more difficult where, as here, any activity that was unconstitutional for appellees to fund was also unconstitutional for the recipients to practice. Because none of the recipients acknowledges participation in unconstitutional activities, appellants will have the difficult burden of establishing that such discrimination existed and that appellees knew of its existence.