**WOMEN'S EQUITY ACTION LEAGUE, et al., Appellees,**

v.

**Lauro F. CAVAZOS, Secretary of Education, et al., Appellants.**

Nos. 88–5065, 88–5068 to 88–5071 and 88–5088.

United States Court of Appeals, District of Columbia Circuit.

Argued May 15, 1990.

Decided June 26, 1990.

---

Alfred Mollin, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Michael Jay Singer and Matthew Collette, Attys., Dept. of Justice, were on the brief for Lauro F. Cavazos, Secretary of Educ., et al., appellants in Nos. 88–5065, 88–5068, 88–5069, 88–5070 and 88–5088 and appellees in No. 88–5071. Robert Loeb, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for Lauro F. Cavazos, Secretary of Educ., et al.

John D. Aldock, John Townsend Rich and Elizabeth M. Brown, Washington, D.C., were on the brief for appellants Ass'n for Retarded Citizens of Georgia, et al. in No. 88–5071.

Elliott C. Lichtman for Kenneth Adams, et al., and Marcia D. Greenberger, Washington, D.C., for Women's Equity Action League, et al., with whom Julius LeVonne Chambers and Janell M. Byrd, New York City, for Kenneth Adams, et al., Brenda V. Smith, for Women's Equity Action League, et al., Hadrian R. Katz and L. Hope O'Keefe for Jimmy Martinez, et al., John D. Aldock and Elizabeth Brown for Ass'n for Georgia, et al., and Coleman S. Hicks and Carolyn Vinson, Washington, D.C., for National Federation of the Blind, were on the joint brief for Kenneth Adams, et al., appellees in Nos. 88–5056, 88–5068, 88–5069, 88–5070, and 88–5088.

Before: RUTH BADER GINSBURG, D.H. GINSBURG and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

We revisit in this opinion a case involving discrimination in federally-funded educational enterprises. The case originated in the district court twenty years ago and has grown ever larger in the two decades since its initiation. Eventually, the action cast the district court as nationwide overseer or pacer of procedures government agencies use to enforce civil rights prescriptions controlling educational institutions that receive federal funds. In a prior opinion, we held that plaintiffs had standing to sue, i.e., that they satisfied the threshold constitutional (article III) requirement to maintain the litigation. *Women's Equity Action League v. Cavazos*, 879 F.2d 880 (D.C.Cir.1989).

We now conclude, however, that Congress has not explicitly or implicitly authorized the grand scale action plaintiffs delineate. We are impelled to reach this terminal point by pathmarking decisions made during the pendency of this litigation, most critically, *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and *Council of and for the Blind v. Regan*, 709 F.2d 1521 (D.C.Cir. 1983) (en banc).

## I. The History of the Controversy

This litigation began in 1970 when black students attending racially segregated public schools in seventeen states complained of the delinquency of the Department of Health, Education, and Welfare (HEW) in enforcing Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. Over the past two decades, the once contained action expanded to colossal proportions: the litigation came to encompass enforcement by units of the Department of Edu-

cation and the Department of Labor of four civil rights measures as they pertain to the education systems of all fifty states—Title VI, forbidding discrimination on account of race or national origin in any federally-assisted program; Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–86, prohibiting discrimination on the basis of sex or visual impairment in educational institutions receiving federal funds; Executive Order 11246, 3 C.F.R. 339 (1964–65), *reprinted as amended in* 42 U.S.C. § 2000e note, proscribing discrimination by government contractors; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, barring federal fund recipients from discriminating against the handicapped.

As the litigation swelled in scope, it shifted in focus. Plaintiffs at first demanded relief from executive defiance of congressional commands, in the form of a deliberate policy of nonenforcement. At the end of 1987, however, the district court observed: "[P]laintiffs [no longer] claim that defendants have abrogated their statutory responsibilities, but rather that, in carrying them out, they do not always process complaints, conduct investigations, issue letters of findings, or conduct compliance reviews as promptly or expeditiously as plaintiffs would like." *See Adams v. Bennett,* 675 F.Supp. 668, 680 (D.D.C.1987).

The details of the litigation's evolution are set out in *Women's Equity Action League v. Cavazos,* 879 F.2d 880 (D.C.Cir. 1989). We recap them here less comprehensively. The original plaintiffs alleged that, in violation of the fifth and fourteenth amendments, and specifically in contravention of Title VI, HEW's Office of Civil Rights (OCR) continued to permit federal funding of racially discriminatory institutions. Plaintiffs' six claims for relief concerned schools from the primary level through higher education.

Title VI prohibits exclusion from participation in, denial of benefits of, and discrimination under any federally-assisted

program on account of race or national origin. The statute directs each federal agency that disburses federal funds to "effectuate" the antidiscrimination mandate. If "compliance cannot be secured by voluntary means," Title VI instructs the agency to initiate a process leading to "the termination of or refusal to grant or to continue [federal monetary] assistance." 42 U.S.C. § 2000d–1. Under a complaint procedure devised by HEW, individuals may file administrative complaints identifying allegedly noncomplying aid recipients. If the agency (OCR, now placed in the Department of Education) investigates and determines the complaint to be meritorious, the agency is then directed to undertake various compliance efforts, potentially culminating in the ultimate sanction of fund termination.[1]

The 1970 complaint, titled *Adams v. Richardson,* charged that the Secretary of HEW and the Attorney General had adopted a policy of nonenforcement calculated to remove "the teeth of Title VI"; this deliberate policy, the complaint alleged, included relaxed standards for compliance, reduced federal monitoring, and an "abandonment of HEW school aid terminations." The district court granted plaintiffs' requests for declaratory and injunctive relief. The court held: "Having once determined that a school district [or state] is in violation of Title VI, and having failed during a substantial period of time to achieve voluntary compliance, defendants have a duty to commence enforcement proceedings." *Adams v. Richardson,* 356 F.Supp. 92, 95 (D.D.C.1973). As a monitoring device, the district court directed HEW to submit periodic reports to counsel for plaintiffs on all steps taken to comply with that court's injunction.

This court, sitting *en banc,* affirmed the district court's order in principal part. We stressed, however, that the disposition we approved "merely require[d] initiation of a

---

1. In 1979, the Supreme Court confirmed that, in addition to this administrative complaint process, individuals injured by discriminatory practices have, directly under the statute, an implied right of action against the discriminating insti-

tutions. *See Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (finding such a right of action under Title IX based on an analysis of the virtually identical provisions of Title VI).

process which, [once initiated and] excepting contemptuous conduct, will then pass beyond the District Court's continuing control and supervision." *Adams v. Richardson*, 480 F.2d 1159, 1163 & n. 5 (D.C.Cir. 1973) (*en banc*).

The government had argued in *Adams v. Richardson* that plaintiffs possessed no right of action under the Administrative Procedure Act (APA), 5 U.S.C. § 701(a)(2), because enforcement of Title VI was committed to agency discretion by law. Rejecting that argument, we pointed to plaintiffs' allegation that HEW had "consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty." 480 F.2d at 1162.[2] Under the statute, this court held, a federal agency lacks discretion to desist when its request to a state or school district for voluntary compliance is not met by responsive action within a reasonable time. *Id.* at 1163. *Adams v. Richardson* did not treat the question whether an APA action might be precluded by reason of the availability of another adequate remedy. *See* 5 U.S.C. § 704 (subjecting to judicial review "final agency action for which there is no other adequate remedy in a court"); *Council of and for the Blind v. Regan*, 709 F.2d 1521, 1531–33 (D.C.Cir.1983) (en banc).[3]

After our 1973 decision, the dimensions of the litigation expanded. The district court, first, extended its decree to cover future as well as past complaints of racial discrimination in the seventeen states identified in plaintiffs' original complaint. The

court also ordered a strict time schedule for processing complaints: OCR was instructed to make a preliminary determination whether a purported violator was in compliance within 90 days of receipt of a complaint; absent a determination of compliance, OCR had 90 days to secure voluntary corrective action; failing success, the agency had to commence an enforcement proceeding within 30 more days. *See Adams v. Weinberger*, 391 F.Supp. 269, 273 (D.D.C.1975).

The litigation, next, swelled to encompass additional classes of plaintiffs as well as other statutory civil rights guarantees—Title IX, Executive Order 11246, and section 504 of the Rehabilitation Act of 1973. *See Adams v. Mathews*, 536 F.2d 417 (D.C. Cir.1976). In 1976, the district court altered and enlarged its order to address the complaints of the newly-joined plaintiffs and the commands of the additional statutory provisions. The court also imposed a schedule governing agency-initiated "compliance reviews" of entire educational institutions and school systems.

In 1977, the federal defendants requested modifications of the 1976 decree, and the parties to the suit eventually entered into a consent order. The consent order set, for all defendants and all relevant civil rights provisions, time frames governing the processing of complaints as well as a schedule for "compliance reviews." The decree covered enforcement obligations nationwide.[4]

---

**2.** The government does "not ask this panel to reconsider that holding," *see* Brief for the Designated Appellants at 23, and we do not do so. We conclude instead that plaintiffs no longer have any claim under the APA because, for the injuries they continue to assert, they have another adequate remedy. *See infra* Part II; *cf.* Brief for the Designated Appellants at 30 (acknowledging that "original finding of abdication may have allowed the court to order the agencies to set up a system for the initiation of enforcement proceedings, and even to order the prompt processing of cases stalled as a result of the previous failure to enforce the statute").

**3.** The lack of reference to this question in 1973 is not surprising. The Supreme Court did not explicitly endorse a private right of action against discriminating institutions receiving federal funds until its 1979 *Cannon* decision. *See*

*supra* note 1. Indeed, the Court noted in *Cannon*, citing this court's 1973 decision in Adams v. Richardson, that "*if* no private remedy exists," only then would a complainant be "relegated to a suit under the Administrative Procedure Act to compel the agency to investigate and cut off funds." *Cannon*, 441 U.S. at 707 n. 41, 99 S.Ct. at 1963 n. 41 (emphasis added). Moreover, *Council of and for the Blind*, which homed in on and elucidated APA section 704's inapplicability to plaintiffs who possess other adequate remedies, was not decided until 1983.

**4.** As the litigation grew, one aspect of plaintiffs' claims remained discrete: the portion of the complaint in *Adams* that concerned institutions of higher education in several southern and border states. In the course of reviewing a district court decision in this segment of the

In August 1982, defendants, officials in a new administration, moved to vacate the 1977 order. On March 11, 1983, the district court denied the motion to vacate and simultaneously entered an order repeating, with slight alterations, the terms of the 1977 decree. Defendants appealed.

A panel of this court remanded to the district court to decide whether plaintiffs possessed standing to pursue the litigation in view of the Supreme Court's decision in *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). *See Women's Equity Action League v. Bell,* 743 F.2d 42 (D.C.Cir.1984). On remand, the district court ruled that plaintiffs lacked standing and dismissed the entire litigation as constitutionally impermissible. *See Adams v. Bennett.* Plaintiffs appealed. On July 7, 1989, this court held that the plaintiffs had standing to sue; stressing that plaintiffs are the intended beneficiaries of the civil rights measures under which they brought suit, we concluded that no article III impediment blocked the litigation. *See Women's Equity Action League v. Cavazos.*

Rather than remand yet again to the district court, the panel ordered the parties to brief and argue several additional, potentially dispositive, issues. *See id.,* 879 F.2d at 887. We now address only one of those issues: whether, in light of post–1973 decisions, particularly *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and *Council of and for the Blind,* plaintiffs may maintain a broad-gauged right of action directly against the federal government officers charged with monitoring and enforcing funding recipients' compliance with discrimination proscriptions. Plaintiffs identify four purported sources of their claims for relief—the civil rights statutes themselves; the APA,

5 U.S.C. § 704; the Mandamus Act, 28 U.S.C. § 1361; and the United States Constitution. We conclude that none of these asserted sources authorizes the continuing, across-the-board federal court superintendence of executive enforcement plaintiffs seek. We therefore affirm the district court's dismissal of this action and pretermit the other issues briefed and argued.[5]

## II. PIVOTAL DOCTRINAL DEVELOPMENTS

The expansion of this litigation coincided with doctrinal shifts that curtailed the availability of suits directly against federal enforcement authorities for tardigrade administration of antidiscrimination prescriptions. With respect to implied private remedies under the antidiscrimination laws, *Cannon v. University of Chicago* was the bellwether decision.

*Cannon* confirmed an implied private remedy under Titles VI and IX against federal fund recipients who engage in proscribed discrimination. Simultaneously, however, *Cannon* pointed the lower courts away from the implication of discrete, broad-gauged rights of action against federal enforcement agencies. The message of *Cannon* was that no private right of action should be inferred from federal legislation absent a showing of approbation from the lawmaking branch. *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979); P. BATOR, D. MELTZER, P. MISHKIN, & D. SHAPIRO, HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 946–47 (3d ed.1988). Moreover, *Cannon's* examination of the legislative history of Title VI suggested that Congress wished to ward off suits against the government of the very kind plaintiffs now press.

---

case, this court cautioned that no federal court has any warrant "to supervise or dictate the details of [HEW's] enforcement program, once that program culminated in an administrative proceeding, itself subject to judicial review, against a recipient state." *Adams v. Bell,* 711 F.2d 161, 165 (D.C.Cir.1983) (en banc), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 678 (1984). The district court, consistent with this guidance, continued to monitor *initiation* of the enforcement process. In a March 24, 1983 order, the district court directed stepped-up fed-

eral oversight of state plans and required periodic progress reports to plaintiffs' counsel. In June 1983, the parties stipulated to the dismissal of the appeal defendants had taken from that higher education order.

5. We also affirm the district court's dismissal as moot of the application to intervene of the Association for Retarded Citizens of Georgia, *et al.* in No. 88–5071.

Just as *Cannon* cautioned against generous judicial recognition of implied rights of action from federal regulatory measures, so *Council of and for the Blind* controlled recourse to the APA. In *Council of and for the Blind,* this court, sitting *en banc,* determined that suits directly against discriminating entities were adequate to redress injuries resulting from the Office of Revenue Sharing's alleged systematic refusal to enforce a statutory proscription against funding such entities. *See* 709 F.2d at 1531–33. Because remedies against the discriminators were adequate, the court held, the APA did not provide a discrete claim for relief against the federal monitoring agency. *Id. See* 5 U.S.C. § 704. *Council of and for the Blind* thus confirmed that "if other remedies are adequate, federal courts will not oversee the overseer." *See Coker v. Sullivan,* 902 F.2d 84, 89 (D.C.Cir.1990). With these doctrinal developments in mind, we turn to plaintiffs' claims to a right of action against federal funding agencies.

### III. IMPLIED RIGHTS OF ACTION

■ It bears emphasis that this litigation, as now contoured, is in no part situation specific. Plaintiffs do not challenge the federal funding agency defendants for supporting any particular institution or program. Instead, they seek across-the-board continuing federal court supervision of the process by which the agencies ensure compliance with the antidiscrimination mandates. As *Cannon* made clear, to hold that an enactment provides an implied right of action of the sort plaintiffs plead, the court must be satisfied that the enactor intended to create such a right. *See supra* Part II. Homing in on that overriding issue, we discern no legislative intent to authorize the grand scale, long term rights of action plaintiffs claim here.

We canvas, first, decisions of this court that plaintiffs believe acknowledge the existence of the implied rights of action they assert. At oral argument, plaintiffs stressed in this regard *Council of and for the Blind,* 709 F.2d at 1530 n. 69, and *Adams v. Bell,* 711 F.2d 161 (D.C.Cir.1983) (*en banc*), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 678 (1984).

*Council of and for the Blind* rejected the claim that Congress authorized an implied right of action directly and discretely against the federal monitor under the Revenue Sharing Act. In the course of that rejection, as plaintiffs correctly observe, the opinion writer distinguished in a long footnote *Adams v. Richardson,* our first *en banc* encounter with the case that grew to become this large litigation. *See supra* pp. 745–746. Any suggestion in the *Council of and for the Blind* footnote, however, that *Adams v. Richardson* held plaintiffs had implied rights of action under Title VI was simply inaccurate. *Adams v. Richardson* was premised on the notion that plaintiffs were proceeding under the APA; absent this premise, the central issue on which the decision turned, whether review was barred by APA section 701(a)(2), would have been irrelevant.[6]

Nor can we extract from *Adams v. Bell* endorsement of the implied rights plaintiffs assert. *Adams v. Bell* affirmed the district court's refusal to enjoin the Department of Education from settling, through a consent decree in the U.S. District Court for the Eastern District of North Carolina, the Department's Title VI enforcement proceeding against North Carolina's higher education system. In the fray we resolved in *Adams v. Bell,* the parties did not join issue on the question whether plaintiffs had, and properly pursued, implied rights of action, and we addressed no such question. Plaintiffs remind us that the *en banc* opinions in *Adams v. Bell* and *Council of*

---

6. Moreover, a distinction relied on in the *Council of and for the Blind* footnote—that "Congress did not expressly provide a remedy for the agency's failure to enforce the nondiscrimination provision of Title VI," *Council of and for the Blind,* 709 F.2d at 1531 n. 69—is undercut by *Cannon.* The Supreme Court had ruled in *Can-* *non* that Congress *impliedly* provided such a remedy, albeit one directed primarily toward the fund recipient, not the funding agency. Finally, we are hesitant to locate dispositive rulings for the court in the scores of footnotes that sometimes fill our opinions.

*and for the Blind* issued on the same day. That fact, however, does not support an inference that the court actually decided in either case a question the parties in neither case posed for the court's resolution.

Plaintiffs rely as well on *Brown v. Califano*, 627 F.2d 1221, 1233 n. 73 (D.C.Cir. 1980), which suggested in dictum that "a private individual could challenge in court HEW's continued funding of a noncomplying district." We do not gainsay that suggestion. Authorization to sue the federal government in a situation-specific suit for improperly funding a particular entity or enterprise, however, is not equivalent to a permit to demand across-the-board judicial supervision of continuing federal agency enforcement. *See Council of and for the Blind*, 709 F.2d at 1530 n. 67 ("Our decision deals only with the situation in which it is alleged that the [agency] has failed adequately to investigate or respond to administrative complaints or take steps to increase its capability to do so. We do *not* decide whether a person aggrieved by conduct of a ... fund recipient that violates [the statute] could bring an action directly against the [agency] if *after* the [agency] received a "holding" ... or a "finding" [that the recipient was discriminating], the [agency] refused to proceed against the [recipient to terminate funds.]"); *see also id.* at 1531 n. 68.[7]

Since the Supreme Court's decision in *Cannon*, a few circuits have considered the question whether the civil rights statutes plaintiffs here invoke supply authorization for judicial supervision of the federal funding agency. None of these courts has resolved the issue in plaintiffs' favor.[8] *See NAACP v. Medical Center, Inc.*, 599 F.2d 1247, 1254 n. 27 (3d Cir.1979) (no right of action implicit in Title VI); *Cousins v. United States Dep't of Transp.*, 880 F.2d 603, 607 (1st Cir.1989) (no right of action authorized by section 504); *Marlow v. United States Dep't of Educ.*, 820 F.2d 581, 583 (2d Cir.1987) (same), *cert. denied*, 484 U.S. 1044, 108 S.Ct. 780, 98 L.Ed.2d 866 (1988); *Salvador v. Bennett*, 800 F.2d 97, 99 (7th Cir.1986) (same). Nor did the pre-*Cannon* cases plaintiffs cite authorize the broad style of action plaintiffs now present here. Rather, those cases sanctioned situation-specific suits against the federal agency based on federal funding of a particular project or district. *See Garrett v. City of Hamtramck*, 503 F.2d 1236, 1246–48 (6th Cir.1974); *Gautreaux v. Romney*, 448 F.2d 731, 739–40 (7th Cir.1971); *Shannon v. United States Dep't of Housing and Human Dev.*, 436 F.2d 809, 818–20 (3d Cir. 1970).[9]

In addition to emphasizing legislative intent as the touchstone for judicial recognition of implied rights of action, *Cannon* indicated, through its examination of the legislative history of Title VI, that Congress did not countenance the type of action plaintiffs have mounted. The Court observed that, as ultimately enacted, Title VI represented "a compromise aimed at protecting individual rights without subjecting the Government to suits." *See Cannon*, 441 U.S. at 715 & n. 51, 99 S.Ct.

---

**7.** Plaintiffs also point to *National Black Police Ass'n v. Velde*, 631 F.2d 784 (D.C.Cir.1980), *vacated*, 458 U.S. 591, 102 S.Ct. 3503, 73 L.Ed.2d 994 (1982), *on remand*, 712 F.2d 569 (D.C.Cir. 1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984). In that case, however, we discussed only questions of standing and mootness; we did not address and resolve whether the plaintiffs had a right of action of the character the complaint delineated.

**8.** In one case decided after *Cannon*, the federal agency did not contest that the plaintiffs had a right of action against it. *See Montgomery Improvement Ass'n v. United States Dep't of Housing and Urban Dev.*, 645 F.2d 291, 292 (5th Cir.1981).

**9.** As we explained above and in *Council of and for the Blind*, recipient-specific suits against the federal funding agency are not equivalent to the action plaintiffs pursue here—"a nationwide suit seeking grand scale relief" in the form of across-the-board supervision of the funding and enforcement practices of the agency. *See Council of and for the Blind*, 709 F.2d at 1530 n. 67; *supra* p. 749. The Supreme Court's implicit approbation of situation-specific decisions in *Cannon* therefore affords plaintiffs scant support. As for the right of action plaintiffs assert, the *Cannon* Court noted the disruptive potential of this very suit and suggested that a private remedy directly against fund recipients, which *Cannon* recognized, would obviate the need for this kind of action. *See* 441 U.S. at 706 n. 41, 99 S.Ct. at 1962–63 n. 41.

at 1967 & n. 51 (noting that "[a]lthough willing to extend private rights against discriminatory recipients, the Government may not have been anxious to encourage suits against itself").

The *Cannon* opinion contrasts two private remedies: suit against a discriminatory fund recipient to terminate the offending discrimination; and suit against the government to terminate federal funding. *See id.* at 711, 715 n. 51, 99 S.Ct. at 1965, 1967 n. 51. The Court found strong support in legislative history for the former, but resistance on the part of lawmakers toward the latter. *See id.* at 710–11 & n. 46, 99 S.Ct. at 1965 & n. 46 (citing 110 Cong.Rec. 1519 (1964) (Rep. Celler); *id.* at 2467 (Rep. Gill); *id.* at 6562 (Sen. Kuchel); *id.* at 7063 (Sen. Pastore); *id.* at 7065 (Sen. Keating); *id.* at 8345 (Sen. Proxmire)).

Plaintiffs maintain, however, that they seek no termination of funding. Instead, plaintiffs say, they sue only to assure that federal agencies do the job Congress entrusted to them by promptly processing complaints and compliance reviews. The distinction plaintiffs press is infirm on two counts. First, the schedule set out in the consent decree leads in the end to fund termination if voluntary compliance is not achieved. Second, an overarching, broad-gauged suit against the federal monitors that bypasses the discriminatory recipients is inconsistent with a legislative compromise "conducive to implication of a private remedy against a [particular] discriminatory recipient," but not "to implication of a private remedy [directly and broadly] against the Government." *See Cannon*, 441 U.S. at 715 n. 15, 99 S.Ct. at 1967 n. 15.

Our judgment is not altered by the inclusion of the United States, or any agency thereof, among parties who may be liable for attorneys' fees in suits under Titles VI and IX. *See* Section 718 of the Education Amendments of 1972, 86 Stat. 369 (previously codified at 20 U.S.C. § 1617); *cf.* 29 U.S.C. § 794a(a)(2) (Rehabilitation Act provision incorporating Title VI remedies

against "recipients of Federal assistance or Federal provider of such assistance"). A federal agency itself might be charged with discrimination, *see Traynor v. Turnage*, 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), or, as provider of financial assistance, with facilitating or encouraging a specific fund recipient's discrimination. *See, e.g., Gautreaux v. Romney*. In such a case, the federal defendant might be answerable both on the merits and for fees. *Cf. Council of and for the Blind*, 709 F.2d at 1531 n. 68.

We add, finally, that plaintiffs have no more tenable claim to an implied right of action under Executive Order 11246 than they do under the statutes on which they rely. Even indulging, without approving, the notion that the executive can create a right of action,[10] we find no evidence of an intent to create the one plaintiffs describe. *Cf. Utley v. Varian Assocs.*, 811 F.2d 1279, 1285–86 & n. 4 (9th Cir.), *cert. denied*, 484 U.S. 824, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987) (rejecting private suit under Executive Order as disruptive of administrative scheme and pretermitting question whether executive has power to create such a right).

## IV. RIGHT OF ACTION UNDER THE ADMINISTRATIVE PROCEDURE ACT

■ Plaintiffs have implied rights of action against federally-funded institutions to redress discrimination proscribed by Titles VI and IX, *see Cannon*, and express rights of action against federally-funded discriminators under section 504 of the Rehabilitation Act, *see* 29 U.S.C. § 794a(a)(2). If they lack a right of action against discriminating contractor employers under Executive Order 11246, *see, e.g., Utley*, they nonetheless have an express, privately-enforceable right to be free from discrimination in employment under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. §§ 2000e(f), 2000e–5. In *Council of and for the Blind*, 709 F.2d at 1531–33, we judged a statutory remedy specifically against the discriminating entity "ade-

---

**10.** *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 1717–18, 60 L.Ed.2d 208 (1979) (stating that principle of separation of powers requires any "substantive" regulation "affecting individual rights and obligations" to be rooted in a grant of power by Congress).

quate," and therefore preclusive of a default remedy under the APA. *See* 5 U.S.C. § 704.

*Council of and for the Blind,* we conclude, controls our decision here. The remedies available to the plaintiffs before us are of the same genre as the one held sufficient to preclude the APA remedy in that case.[11] Plaintiffs contend that in *Council of and for the Blind,* we deferred to a congressional judgment that a remedy other than review under the APA was adequate; no such congressional judgment, they emphasize, figures in this case. We cannot avoid the force of our precedent on that basis.

In *Council of and for the Blind,* as in our more recent *Coker* decision, 902 F.2d at 89–90 & n. 5, we independently examined the adequacy of other remedies available to plaintiffs. Several paragraphs of text in *Council of and for the Blind* treat the issue. *See* 709 F.2d at 1532–33. A few lines in a lengthy footnote, it is true, assert deference to "the congressional judgment," *id.* at 1532 n. 75, but the footnote reference is conspicuously a response to the dissent's charge that the court's decision opposed "the will of Congress." *Id.* at 1551 n. 82.

To the extent Congress' assessment of alternate remedies is relevant, moreover, *Cannon* suggests that Congress considered private suits to end discrimination not merely adequate but in fact the proper means for individuals to enforce Title VI and its sister antidiscrimination statutes. The Court stated that implied private rights of action against discriminating institutions were intended by Congress "to

provide individual citizens effective protection against [discriminatory] practices." *Cannon,* 441 U.S. at 704, 99 S.Ct. at 1961. Referencing this particular case, the *Cannon* Court observed that an APA suit to compel investigation and fund termination, although available "if no private remedy exists," "is far more disruptive of HEW's efforts efficiently to allocate its enforcement resources ... than a private suit against the recipient of federal aid." *See* 441 U.S. at 706 n. 41, 99 S.Ct. at 1962 n. 41.[12] Consonant with this view, the legislative history of Title VI contains several comments by members of Congress, for example, Senator Ribicoff, indicating that " 'alternative remedies, principally lawsuits to end discrimination, would be the preferable and more effective remedy.' " 441 U.S. at 705 n. 38, 99 S.Ct. at 1962 n. 38.

Plaintiffs urge, however, that individual actions against discriminators cannot redress the systemic lags and lapses by federal monitors about which they complain.[13] We rejected similar pleas in *Council of and for the Blind* and *Coker. See* 709 F.2d at 1532–33; *Coker,* 902 F.2d at 90 n. 5. Suits directly against the discriminating entities may be more arduous, and less effective in providing systemic relief, than continuing judicial oversight of federal government enforcement. But under our precedent, situation-specific litigation affords an adequate, even if imperfect, remedy. So far as we can tell, the suit targeting specific discriminatory acts of fund recipients is the only court remedy Congress has authorized for private parties, situated as plaintiffs currently are.[14]

11. The Revenue Sharing Act authorizes, upon exhaustion of administrative remedies, private suits to check specific discriminatory acts of recipients of revenue sharing funds. *See* 31 U.S.C. § 6721(a).

12. Citing *Cannon,* the government does not dispute that if no private remedy against discriminating institutions existed, "there would be a right of action under the APA against OCR to protect the rights secured by Title VI." Reply Brief for the Designated Appellants at 10 n. 7.

13. We note again that plaintiffs no longer complain of a conscious policy of nonenforcement. *See supra* p. 744–745. Indeed, they point out

that OCR, "freed of all judicial orders," has on its own substantially adopted the time rules formerly embodied in a court decree. *See* Brief for Plaintiffs–Appellees at 8–9.

14. The "law of the case" doctrine does not prevent us from applying *Council of and for the Blind* as the dispositive ruling. The court has not previously addressed the question whether plaintiffs have another adequate remedy within the meaning of 5 U.S.C. § 704, and "[q]uestions that merely could have been decided do not become law of the case." *Bouchet v. National Urban League,* 730 F.2d 799, 806 (D.C.Cir.1984). Even were we to accept plaintiffs' argument that the issue was implicitly decided in *Adams v.*

## V. Right of Action Under the Mandamus Act and the Constitution

■ *Council of and for the Blind* forecloses as well plaintiffs' assertion of rights to proceed under the Mandamus Act, 28 U.S.C. § 1361, and the fifth amendment to the Constitution. Mandamus is an extraordinary remedy available only if other relief is inadequate; a determination that an APA action is barred by another remedy therefore demands the further conclusion that mandamus is not available. *See Council of and for the Blind,* 709 F.2d at 1533.

■ As for plaintiffs' constitutional claim, *Council of and for the Blind* held that an agency's failure to process discrimination complaints in the manner required by federal statutes and regulations does not deprive complainants of constitutional rights:

> The [agency's] failure to process [plaintiffs'] complaints does not *extinguish* their [statutory] rights ..., it merely denies them the assistance of the [agency] in vindicating those rights. In order to state a legally cognizable constitutional claim, [plaintiffs] must allege more than the deprivation of the *expectation* that the agency will carry out its duties. If we concluded that such an expectation was protected under the Constitution, this court would be swamped with constitutional claims because every agency deviation from the statutory norm would raise constitutional questions.

*Council of and for the Blind,* 709 F.2d at 1533–34 (emphasis in original).

*Richardson,* we would not be bound by that decision. The "law of the case" doctrine is a prudential rather than a jurisdictional restriction on a court's authority to reconsider an issue. *See Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912). As we explained in Part II, the dispositive doctrine has evolved since Adams v. Richardson. When intervening legal authority makes clear that a prior decision bears qualification, that decision must yield. " 'Law of the case' cannot be substi-

## Conclusion

In sum, instructed by currently controlling precedent, we hold that the generalized action plaintiffs pursue against federal executive agencies lacks the requisite green light from the legislative branch.[15] We do not suggest that such an action could not be authorized. *See Women's Equity Action League v. Cavazos* (holding that plaintiffs possess article III standing). The courts, however, may not on their own initiative create the claim for relief. That authority resides in Congress. For the reasons stated, the district court's dismissal of plaintiffs' complaints is

*Affirmed.*

tuted for the law of the land." *See* Vestal, *Law of the Case: Single Suit Preclusion,* 1967 Utah L.Rev 1, 12.

**15.** *Cf., e.g.,* 33 U.S.C. § 1365(a)(2) (authorizing citizen suits against Administrator of Environmental Protection Agency for failure to enforce compliance with Federal Water Pollution Control Act); 42 U.S.C. § 7604(a)(2) (permitting similar suits with respect to Clean Air Act enforcement).