WASHINGTON LEGAL FOUNDATION,
Plaintiff,

v.

Lamar ALEXANDER,

and

Michael L. Williams, Defendants.

Civ. A. No. 91–0600.

United States District Court,
District of Columbia.

Nov. 15, 1991.

Richard A. Samp, Washington Legal Foundation, Washington, D.C., for plaintiff.

Mark Winslow Batten, U.S. Dept. of Justice, Office of Information and Privacy, Sheila M. Lieber, U.S. Dept. of Justice, Civil Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

This case is before the Court on defendants Williams' and Alexander's motion to dismiss for failure to state a claim and lack of subject matter jurisdiction. Fed. R.Civ.P. 12(b)(6), 12(b)(1). Because the Court finds that the plaintiff's have presented no cognizable claim under federal law, defendants' motion is granted and this case is dismissed.

## BACKGROUND

For the purposes of this motion the Court construes the complaint in the light most favorable to the plaintiff and takes its allegations as true. *McGowan v. Warnecke*, 739 F.Supp. 662 (D.D.C.1990). The alleged facts are as follows.

Defendants in this case are the Secretary and Assistant Secretary of the United

States Department of Education ("DOE"). Plaintiffs are the Washington Legal Foundation ("WLF") and seven white college and law students. Plaintiffs claims are based on the fact that the individual plaintiffs and some student WLF members attend universities and law schools which award scholarships to minority students. The scholarships at issue are ones which are exclusively available to African–American, Hispanic, and Native American students. The purpose of these scholarships is to provide minority students with new educational opportunities. In the past, these same opportunities have been denied to many minority students for no reason other than the color of their skin. Plaintiffs claim that awarding such scholarships violates Title VI of the Civil Right Act of 1964. Title VI prohibits educational institutions receiving Federal financial assistance from discriminating on the "ground of race, color, or national origin." 42 U.S.C. § 2000d. The WLF claims that scholarships offered to minority students violate Title VI because all students—whites as well as minority students—are not equally eligible for them.

Plaintiffs, however, do not bring suit against the universities and law schools who award these scholarships. Instead, they are suing the Department of Education, claiming that despite Title VI's "unambiguous prohibition" against "racial discrimination," that the DOE has failed in its "mandatory obligation affirmatively to enforce Title VI by effective means." Complaint at ¶ 21–22. The DOE responds that they are in the process of actively reviewing their policy regarding race-based scholarships, but that the issue as to whether and when such scholarships violate Title VI is anything but "unambiguous." There is no basis for this Court to find that the defendant, DOE, is not acting in good faith in their present review of the very policy issue which the WLF has asked this Court to decide.

Plaintiffs do not limit their request for relief to the alleged harm suffered by the named plaintiffs in this case. Rather, the WLF and the individual plaintiffs would have this Court intervene in DOE affairs by making sweeping policy statements and supervising the enforcement of those policies. First, plaintiffs demand that this Court render a declaratory judgment that "DOE's failure to implement a policy against race-based scholarships is arbitrary, capricious, and/or contrary to law." Complaint at 14. Second, plaintiffs ask the Court to order DOE to issue administrative rules and regulations prohibiting any recipient of DOE funding from awarding a scholarship based on the race of the recipient. Third, plaintiffs ask this Court to supervise DOE in establishing and implementing a comprehensive and "effective" program to enforce Title VI's alleged prohibition against "race-based" scholarships. *Id.* In short, plaintiffs ask this Court to cut short a complex DOE policy review process and force the agency to design and implement an enforcement scheme to effectuate a policy decision of the Court.

## DISCUSSION

A private plaintiff must possess a "cause of action" in order to seek judicial enforcement of statutory obligations. *See Council of and for the Blind of Del. Cty. Valley v. Regan*, 709 F.2d 1521 (D.C.Cir. 1983). In bringing this suit against the DOE, an agency of the federal government, plaintiffs rely on three federal statutes to supply them with a cause of action.

First, plaintiffs claim that Title VI of the Civil Rights Act 1964 affords them a cause of action. Second, plaintiffs point to the Administrative Procedure Act ("APA") which creates a general right of judicial review of "agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Third, plaintiffs cite to the Mandamus Act, 28 U.S.C. § 1361, as entitling them to injunctive relief against these government officials. Plaintiffs' reliance on all of these statutes is misplaced.

### A. Cause of Action Under Title VI

Title VI provides private plaintiffs no express cause of action against either educational institutions who receive federal funding or the governmental agency

charged with enforcement. *See Cannon v. University of Chicago,* 441 U.S. 677, 699–700, 99 S.Ct. 1946, 1958–59, 60 L.Ed.2d 560 (1979). *Cannon,* however, confirmed that an implied cause of action did exist under Title VI for a private plaintiff to sue a discriminatory fund recipient to terminate the offending discrimination. *Id.* Plaintiffs would now have this Court expand such an implied cause of action to encompass suits against the federal government as well. Both the Supreme Court and this Circuit have found, however, that Congress did not intend such an action to be available.

The *Cannon* Court conducted an exhaustive review of Title VI's legislative history in order to determine which implied causes of action were available. In finding Title VI did envision an implied cause of action against the discriminating institutions, the Court specifically contrasted such a cause of action with an action against the government. The Court found:

> "In it's final form, § 601 was far more conducive to implication of a private remedy against a discriminatory recipient than was the original language, but at the same time was arguably *less* conducive to implication of a private remedy against the Government ... to compel the cutoff of funds. Although willing to extend private remedies against discriminatory recipients, the Government may not have been anxious to encourage suits against itself."

*Cannon,* 441 U.S. at 715 n. 51, 99 S.Ct. at 1967 n. 51 (emphasis in original). More recently, this Circuit, has squarely held that no implied right of action exists under Title VI to sue the enforcing agency. *See Women's Equity Action League v. Cavazos,* 906 F.2d 742, 748–50 (D.C.Cir.1990) (*"WEAL"*).[1] Thus, the type of suit which plaintiffs now bring, is not permissible under Title VI of the Civil Rights Act of 1964.

Plaintiff's attempt to distinguish *WEAL* by claiming that they have avoided seeking the type of the across-the-board relief rejected in that opinion. Evidently, plaintiffs believe that because some of the parties in their complaint are actual students and because the complaint mentions the names of specific universities that they can evade the *WEAL* court's rejection of "across-the-board judicial supervision of continuing federal agency enforcement." *WEAL,* 906 F.2d at 749. That reading makes *WEAL* into little more than a requirement of artful pleading. *WEAL,* however, was more than a exercise demanding that plaintiffs simply: "Allege discrimination. Give examples."

Rather, *WEAL* demands that Courts look to the actual remedies demanded in the complaint in order to assess whether Title VI provides an implied cause of action. In the present case plaintiffs' requested remedies reveal that their suit is just the type of "broad-gauged suit against the federal monitors that bypasses discriminatory recipients" which *WEAL* held that Title VI did not encompass. *Id.* at 750. Plaintiffs in this case do not style their request for relief as aimed at remedying specific instances of discrimination. Rather, the WLF and the other plaintiffs readily admit that they "are not asking that the Court require DOE to initiate enforcement actions against particular schools." Plaintiffs' Response Memorandum at 10. The *WEAL* court, however, rejected the plaintiffs' right of action in part for the exact reason that the plaintiffs had not brought "situation specific suits against the federal agency based on federal funding of a particular project or district." *WEAL,* 906 F.2d at 749. Thus, plaintiffs have not asked for the type of relief which *WEAL* hinted would be permissible against the government.

What the WLF and other plaintiffs do ask this Court to do is to compel the DOE to promulgate rules and regulations covering this new area of enforcement. In addi-

---

1. Plaintiffs contend that *Adams v. Richardson,* 480 F.2d 1159 (1973) (en banc), supports a right of action against the government under Title VI. The *WEAL* Court, however, made it clear that *Adams* was brought and decided based on the APA and that "Any suggestion ... that *Adams v. Richardson* held plaintiffs had implied rights of action under Title VI was simply inaccurate." *WEAL,* 906 F.2d at 748.

tion, plaintiffs ask this Court to require the DOE to begin a pattern of affirmative enforcement concerning race-based scholarships—an area currently under agency review—and to determine whether such a plan is "effective." Complaint at 14, ¶ 3. These are just the type of sweeping remedies demanded by the plaintiffs in *WEAL* and which that court found that Congress had not authorized in Title VI.

### B. Cause of Action Under the Administrative Procedure Act

■ Plaintiffs also claim that they have a right of action against the DOE under the APA. The APA creates a general right of review in instances where there is "agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Because Title VI does provide an "adequate remedy"—namely a suit against the alleged discriminator—the APA provides no right of action.

In *WEAL*, the court faced a Title VI case and found the implied right of action "specifically against the discriminating entity 'adequate' and therefore preclusive of a default remedy under the APA." 906 F.2d at 750–51. Citing *Cannon* and analogizing to this Circuit's earlier decision in *Council for the Blind*, the *WEAL* court found that:

> "Suits directly against the discriminating entities may be more arduous, and less effective in providing systemic relief, than continuing judicial oversight of federal government enforcement. But under our precedent, situation-specific litigation affords an adequate, even if imperfect, remedy."

*Id.* at 751. Title VI itself, then, provides the WLF and the individual plaintiffs with an adequate remedy. The proper course for bringing discrimination claims is to sue the alleged discriminators directly under Title VI. In enacting Title VI, Congress intended that such private actions were the correct course of enforcement. Rather than the type of broad based litigation which plaintiffs now bring, "Congress considered private suits to end discrimination not merely adequate but in fact the proper

means for individuals to enforce Title VI." *WEAL*, 906 F.2d 742.

The plaintiffs, however, claim that this Circuit's decision in *Adams v. Richardson,* an earlier chapter in the same litigation that produced *WEAL*, authorizes a direct action under the APA against the agency. *See Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973) (*en banc*). It is true that *Adams* leaves room for direct suits against the agency in certain circumstances. Specifically, the *Adams* court upheld the plaintiff's right of action directly against the agency only after "HEW concluded that ten states were operating segregated systems of higher education in violation of Title VI." 480 F.2d at 1164. *Adams,* then, dealt with a situation where the agency had made a prior determination of noncompliance with Title VI. *Adams* was a discrimination suit in which the only issue was enforcement, not whether the activity in question was discrimination at all. Thus, in upholding the injunction issued by the district court, the *Adams* court noted that "[t]he injunction does not direct the termination of any funds, nor can any funds be terminated prior to a determination of noncompliance." *Adams,* 480 F.2d at 1163. *Adams,* thus allows courts to enjoin an agency to enforce its own determination that educational institutions have discriminated in violation of Title VI. The issue of noncompliance itself, however, was not placed at issue by the agency in *Adams.*

The current case, however, presents a somewhat different circumstance at this time. The issue of whether or not the programs which WLF challenges violate Title VI is not an easy one. The DOE is currently in the process of conducting a policy review on the issue of race-based scholarships. The Court has no reason to believe that the Government is acting other than in the utmost good faith in making its determination on this issue. Plaintiffs' appearance before this Court prior to DOE's completion of its review in this sensitive area is thus premature. The DOE has not yet finished balancing all the competing interests to be able to intelligently resolve the issue.

These minority scholarship programs were designed, in large part, to remedy the very systemic biases which were addressed in *Adams* and Title VI itself. The programs were implemented to afford certain of our underclass citizens their opportunity to obtain the American Dream. That dream has been unattainable for many minority students because of the reality of past pernicious discrimination practices.

Nowhere are the effects of racial discrimination so devastating as in the area of education. The lack of equal educational opportunities for minority citizens, leads ultimately to the inability to compete effectively in the job market. That, in turn, disadvantages future generations. The scholarship programs challenged by the WLF are intended to break this vicious cycle. They strive to provide minority students with the equal opportunities that have long been denied them solely on the basis of the color of their skin.

The WLF, in essence, asks the Court to force the DOE to mechanically apply so-called "race neutral" principles. That application, arbitrarily made might well have the effect of depriving disadvantaged citizens of the opportunity to obtain the education necessary to achieve true equality. Modest actions as exemplified by some of these scholarship programs funded by some of our generous citizens and their eleemosynary organizations are an important remedial benefit for peoples who have suffered from past and possibly even current de facto discrimination. This case presents the clash of two important societal principles—"race-neutrality" versus programs designed to provide equal educational opportunity to a segment of our citizenry which has suffered from past and possibly even current discriminatory practices. These are complicated issues that require careful balancing of competing important interests.

When such a complex balancing process is involved, both *WEAL* and *Adams* tell us that this Court should not intervene and preempt agency action before the agency itself has fully evaluated all the relevant issues and has decided on the policy and legal course it intends to pursue. The agency is first entitled to make its own legal and policy decisions. In *WEAL*, the court reasoned that one of the disadvantages of suits against the agency itself was that these suits were "far more disruptive of [the agency's] efforts to efficiently allocate its enforcement resources ... than a private suit against the recipient of federal aid." *WEAL*, 906 F.2d at 751, *citing Cannon*, 441 U.S. at 706 n. 41, 99 S.Ct. at 1962 n. 41. *WEAL*, then, recognizes that the more complex an agency decision concerning compliance and resource allocation, the more likely judicial interference would unduly burden the agency's enforcement decisions. Even in *Adams*, where there had already been a finding of noncompliance, the court was hesitant to intervene in agency policy in the then new area of higher education. Comparing that area to the familiar area of primary and secondary education, the court held that "the stark truth of the matter is that [the agency] must carefully assess the significance of a variety of new factors as it moves into an unaccustomed area." 480 F.2d at 1164. The WLF's claim presents the DOE with a complicated balancing process concerning both compliance and enforcement. In that context, *WEAL* and *Adams* both argue against premature court interference.

The APA provides little authority for the Court to cut short the agency's own policy making process. First, the agency has not made a hard policy decision which would require it to act at all. Second, even were there to be such a decision, the agency would then have to weigh a variety of factors and make difficult resource allocation decisions regarding a new area of Title VI enforcement. When such findings have not been made and when the plaintiffs have available to them other adequate remedies, a Court should not step in prematurely and make the agency's decision for it.

There are good and practical reasons why the attack made by plaintiffs should first be fought at the level of the alleged offending universities. Not all scholarship programs are the same. Indeed, in some instances the scholarships may come from private funds and the university's involve-

ment is minimal at most and clearly does not offend the dictates of Title VI. There are other instances where schools might purport to give out scholarships on a race neutral basis but, because of their historical beginnings, continue to apportion the scholarships on a de facto racial basis in such instances often preferring members of the majority race. In these instances a policy of so-called race neutrality would continue to unfairly benefit white students at the expense of minorities. These are all factors that the defendants must consider as they attempt to design a just and legally proper course.

In the meantime, plaintiffs' assault must be made at the university level where courts will be presented with fact specific contexts that will allow them to determine whether the particular program under consideration would come into conflict with nondiscrimination laws. Thus, there are good reasons why the APA does not provide the Court with jurisdiction to make new agency rules and allocate enforcement resources when the plaintiffs have an adequate private cause of action against the alleged discriminators.

### C. Cause of Action Under the Mandamus Act

■ *WEAL* also forecloses plaintiffs' rights to proceed under the Mandamus Act. 28 U.S.C. § 1361. *See WEAL*, 906 F.2d at 752. Mandamus is an extraordinary remedy which is unavailable unless all other relief is inadequate. Just as the availability of private suits against the alleged discriminators is an adequate remedy which bars action under the APA, it also leads to the conclusion that mandamus is also not available.

### CONCLUSION

The WLF and the individual plaintiffs have no cause of action against the DOE at this time. Neither Title VI, the APA nor the Mandamus Act contemplates such a suit against the federal government. In the absence of a Congressional enactment, no cause of action against the federal government exists. Given the complex na-

ture of the WLF's claims, both precedent and judicial prudence dictate that courts should defer to the executive branch's good faith attempts to balance the competing factors and make the initial legal policy and enforcement decisions.